Nott, Ch. J.,
delivered the opinion of the court:
The contract in this case, bearing date the 29th of October, 1892, provides “ that if at any time it should be found advantageous or necessary to make any change or modification in the aforesaid plans and specifications, such changes or modifications must be agreed upon in writing.” The parties acted under this provision no less than eleven times. There are eleven supplemental contracts, in one of which the trivial sum of $17 is the total consideration.-
The defendants now contend that the claimants can not recover upon some of their causes of action because this provision of the contract was not complied with. It is manifest, however, that neither of the parties to the contract considered the provision as applicable to most of the matters now in issue. The Chief of the Bureau of Yards and Docks certainly did not. He did not seek to make any change or modification in the “aforesaid plans and specifications” which would involve additional expense. On the contrary, he regarded everything that was done under his direction and requirements as an obligation resting' upon the contractors under the original contract. The one party maintained that the contractors were bound by the contract; the other party maintained that they were doing extra work or furnishing better material under requirements which were not contained in the contract.
The contract also provides that “ no omission in the plans or specifications of any detail, object, or provision necessary to carry this contract into full and complete effect, in accordance with the true intent and meaning hereof, shall operate to the disadvantage of the United States, but the same shall be satisfactorily supplied, performed, and observed by the contractors. And all claims for extra compensation by reason of, or for, or on account of, such extra performance are hereby,'in -consideration of the premises, expressly waived.”
To the court it seems plain that this provision applies only to “omissions,” to matters of “detail,” and only to such “omissions,” and “matters of detail” as shall be “necesscury to carry the contract into full and complete effect, in accordance with the true intent and meaning thereof.” It cannot be held, in the opinion of the court, that the things which *544 the Chief of the Bureau compelled the contractors to do were “omissions” on “matters of detail,” or “necessary” to carry the contract into effect. On the contrary, they were clearly changes or additions which the Chief of the Bureau had or had not the right to require within the true intent and meaning of other provisions of the contract.
The contract also pi’o vides “ that if any doubts or disputes arise as to the meaning or requirements of anything in this contract, or if any discrepancy occurs between the aforesaid plans and specifications and this contract, the matter shall be at once inferred for the consideration and decision of the Chief of the Bureau of Yards and Docks, and his decision thereon shall be final, subject, however, to the right of the contractors to appeal from such decision to the Secretary of the Navy, who, in case of such appeal, shall be furnished by the contractors with a full and complete statement of the grounds of their appeal, in writing, and shall thereupon take such action in the premises as, in his judgment, the rights and interests of the respective parties to this contract shall require, and the parties of the first part hereby bind themselves and their heirs and assigns, and their personal and legal representative, to abide by his, the said Secretary’s, decision in the premises.”
But here it must be noted that this fourteenth provision of the contract is grounded upon “doubts and disputes,” which are to be at once referred for the consideration of the Chief of the Bureau, whose decision is to be final unless appealed from to the Secretary. The doubts and disputes are manifestly those which might arise between the contractors and the engineer in charge. In other words, the contract provided that before the provision should become practically binding, it would be necessary that the engineer in charge, the Chief of the Bureau, and the Secretary of the Navy should all decide against the contractors, and that two of the three should be disinterested. As regards some of the matters in controversy there was no “doubt” or “dispute” on the part of the engineer in charge — his decision was on the side of the contractors — the controversy was begun by the Chief of the Bureau.
If the full intent and effect be given to this provision which *545 tbe defendants now ascribe to it, the contractors might as well ■ have written an agreement on half of a sheet of paper, bind-, ing themselves to perform whatever work and furnish whatever material the Chief of the Bureau might require, and accept therefor whatever remuneration the .Secretary of the Treasury might be pleased to give them.
In Douglas’s Case (2 C. Cls. B., 347) this court said “there are agreements to abide by the decision of a third person, reciprocally obligatory upon both the parties, which are always to be upheld — as an agreement that wagons to be manufactured shall be examined and approved by a certain inspector (Albert Droion’s Case, 1 C. Cls. B., 307), or that the title to an estate to be conveyed shall be approved by the Attorney-General {H&rchamts1 Exchange Company's Case, lb. B., 332), but a decision under this contract by the referee, made after the contract has expired, and when the rights of the parties had become settled and fixed thereunder, can not preclude them from appealing to a court of j ustice. ” In Hurts v. Litchfield (39 N. Y. R.), where a contract provided that “in case any question arises under such contract in relation to the work, both as to value of work added or. deducted, the same shall be adjusted by the architect,” the Court of Appeals held that the provision was not binding, being against the policy of the common law, and having a tendency to exclude the jurisdiction of the courts, provided with ampler means to entertain and decide legal controversies.” The court also said that such stipulations “do not deprive the party of his action, either at law or in equity, to enforce his rights.” Many cases are cited, English and American. The Court of Appeals recognized as valid such stipulations as have always been upheld in this court, cases “where an agreement makes the procurement of an architect’s certificate a condition precedent to any right of action; then,” says the court, “the rule is as claimed by the defendant in this case, but such is not the agreement between these parties.”
In the many cases in which it has been held that where a contract provides that the architect or the engineer in charge shall determine the quantity or the fitness of the material or the sufficiency of the work his decision is ordinarily final it has been the reference of a matter of fact to the arbitrament *546 of a person peculiarly fitted by his own knowledge concerning- the subject of dispute to determine a simple fact. But since the decision of the Supreme Court in Glarlds Case (6 Wall. R., 543) it has never been supposed that even the engineer’s system of measurement was conclusive of the contract- or’s rights. (Collins and Farwell, 34 C. Cls. R., 294.) In the cases of all building contracts there are matters to be determined as the work progresses. Some one must pass upon the fitness of the material, the sufficiency of the workmanship, the amount of work performed, etc. These are matters which can not bo-left until a building is completed; it is for the interest of both parties that they be settled as the work proceeds. The architect or engineer in charge being the person most familiar with the work, and professionally fitted to pass upon such questions, is ordinarily designated as the referee or arbitrator to determine them. Such agreements for such arbitraments must be upheld. But the agreement now under consideration is a very different thing. It goes far beyond anything that has come before the court since the case of Douglas, for it sets up the Secretary of the Navy, having no personal knowledge of the matter in dispute, as being in effect an appellate court of justice' — the court of last resort. It in effect binds one party to abide as to every matter of fact, and as to every question of legal right, by the decision of the other party. Lord Coke said centuries ago that it becomes no man to be both judge and party in the same case.
Certain statutes have been interposed as a defense (Rev. Stat.,secs. 3744, 3697, 3722,3733). Some of these are man-dator y; some merefy directory. In Clark v. United States (95 U. S. R., 539) the Supreme Court held that the statute which requires contracts to be reduced to writing is mandatory, but at the same time expressly held that “where, however, a parol contract has been wholly or partly executed on one side, the party performing will be entitled to recover the fair value of his property or service as upon an implied contract for a quantum meruit.” The Supremo Court also held about the same time that “the principles which govern inquiries as to the conduct of individuals in respect to their contracts are equally applicable where the United States are *547 a part3r,” and that where an individual contractor would be liable for having ordered the suspension oBthe work “the United States must answer according to the same rule.” (United States v. Smith, 94 U. S. R., 214-217.) In Semmes (& Barbour (26 C. Cls. B., 119), sections 3679 and 3732 of the Bevised Statutes were interposed as a defense, and there was also a statute relied upon which forbade contracts to be made for buildings “to be used for the purposes of the Government in the District, of Columbia;” but the court held that these provisions of law “undoubtedly applied to express contracts,” and “have no application to that class of implied contracts which arise from acts of public officers in the performance of their duties in carrying on the business of the Government.” In many cases it has been held that though Congress may limit the expenditure to the amount appropriated, the contractor “is not bound to know the condition of the appropriation account at the Treasury.” (Myerles Case, 33 C. Cls. R ., 1, and cases cited.)
In the case mow before us it was also supposed by the accounting officers that the provisions of the contract requiring new or additional work to be ordered in writing bound the Secretary of the Navy, himself, and that ho could neither order such work to be done in any other way than that provided by the contract, nor pay for it when it had been done.
As such provisions in contracts are constantly causing disputes and controversies, we now formulate the principles governing them, which we regard as well settled:
1. Where additional work or better material than the contract requires was ordered by a subordinate officer having no such authority, the compliance of the' contractor must be regarded as voluntary service, and no contract can be implied, even though the defendants acquired a benefit by the change; that is to say, the Government can not thus be compelled to build a better building than was intended by its responsible contracting officer. (.Driscoll’s Case, 34 C. Cls. R., 508, and cases cited, p. 524.)
2. Where, on the contrary, the alterations or additions' were ordered by an officer clothed with responsibility and authority to contract, a contract will be implied to the extent *548 of the benefit which the defendants have received, and the claimant will recover in quantum meruit. (Hawkins v. United States, 96 U. S. R., 689.)
3. Where a contract expressly provides that alterations or additions must be ordered in writing and the cost be agreed upon before the work be done, the principals to the contract in ordinary cases between individuals may waive the requirement; so in the case of Government contracts, the officer who has authority to order or agree in writing must be con-sideredyw hoto vice as the principal, and if he orders a change orally, and the contractor acts on the order and performs the extra work, the parties will be deemed to have mutually waived the requirement. (Ford's Case, 17 C. Cls. R, 75.)
In a few words, it may be said that' the statutes and these contractual provisions must be construed for the protection of the Government and not for the embarrassment of contractors; and that they can not be used by public officers to cloak breaches of contract or justify improper interference with the work, or to acquire in any way an unfair advantage over the other party. It is for the interest of the Government that its good faith and business responsibility shall be upheld. A policy which precludes legal redress will drive every prudent and responsible contractor out of the field of competition.
The principal item in controversy is for the sandstone of which the dock was constructed. The specifications, which are a part of the contract, and upon which the claimants predicated their bid, provide: “The ashlar must be of granite or sandstone of quality approved by the engineer. All stone must be hard, clean, and free from seams and imperfections, and of good bed and build. ” Two bids were submitted by the claimants, one for granite and one for sandstone. The defendants’ officers accepted the bid for sandstone. The claimants then tendered a sample of the stone and the engineer in charge examined it and visited the quarry from which it was taken. He made a careful examination and satisfied himself as to the quality of the stone, its uniformity, its freedom from sand and mica pockets, from pebbles and boulders; he noted the reaction of the stone under channelers then in operation; ho visited the works where the stone was being sawed and noted the reaction under the saw; he examined unused *549 blocks of stone which had been exposed to the weather for a long time, and he examined it in many other ways. After these tests and examinations the engineer approved the stone so tendered by the claimants, which was known as the “Tenino stone,” and informed the claimants that it would be accepted for all work under the contract. The claimants thereupon proceeded to contract with the- owners of the quarry for that stone, and the owners of the quarry proceeded to excavate and deliver stone. A carload was furnished and delivered at the site of the dock, consisting of 2,377 cubic feet, which was accepted by the engineer in charge and the usual voucher for payment given, to wit: That it was “of good quality and in all respects in conformity with the written contract.” The voucher was approved by the commandant of the navy-yard.
Before this voucher was paid an organization known as the “Tacoma Trades Council of the State of Washington” complained to the Navy Department of the bad quality of the stone. It is asserted by the claimants that this was a malicious act in retaliation for the refusal of the claimants and the' owners of the quarry to employ - union labor. With this charge the court has nothing to do; the “Tacoma Trades Council ” is not now on trial. But any person has a right to lodge a complaint with the proper authorities where there is a public work that is not being properly carried out, and the executive authorities in charge of the work would be wanting-in vigilance if they did not look into the complaint.
In this case the Chief of the Bureau did examine the stone which the claimants furnished, and he caused tests to be made more or less satisfactory to himself; and he examined stone from other quarries, and he decided to reject the-stone which the claimants had agreed to furnish, and compelled them to procure stone from another quarry, which he designated, at a greatly increased price. The claimants, after protesting and appealing to the Secretary of the Navy, who affirmed the decision of the Chief of the Bureau, complied with the requirement. They seek to recover the additional cost which they were subjected to by this action of the Department.
On the part of the defendants it is said that by the fourteenth paragraph of the contract the claimants bound themselves to *550 abide in all cases of doubts or disputes by the decision of the Chief of the Bureau, subject only to an appeal to the Secretary of the Navy, and that the contract also provided that the work to be done under it should be entirely satisfactory to the Chief of the Bureau. It is true that the Chief of the Bureau was the contracting officer, and it is true that it was his duty to secure a public work of the best character. It is also true that if ho found that the work which had been done was not going to secure all that was needed or intended for the public welfare it was his duty to have the work done over again. But it is also true that when he invited bids ho described to the bidders the work which they should do and the materials which they should famish, and among other things he told them that the stone which they should furnish should be subject to the approval of the engineer whom he might select to bo the agent of the Government in chai’ge of the work. He imposed no other condition. Furthermore, it is also true that he made that proposition a part of the contract, and that he allowed the engineer in charge to examine the quany and select the stone, and notify the claimants that this stone was accepted and approved, who consequent^, on the faith of the approval, proceeded to bind themselves to their subcontractors, the owners of the quarry, for the procurement of the stone, and he allowed the parties to proceed to excavate and prepare and deliver stone. Finally, it is also true that he and not the engineer in charge rejected the stone; and that he and not the engineer in charge selected the other stone which the claimants were required to furnish. In a word, he departed from the terms of the contract both positively and negatively, bjr himself deciding a question which it was agreed another person should decide, and by not cany-ing out that which the engineer in charge (who was on the ground and could give his personal investigation to the stone and the quarry from which it was taken, and the works and edifices in which it had been tested by actual use) had in effect determined. To hold that the Chief of the Bureau could do this would be to hold that he could tear the contract to pieces at an}7 time during the performance of the work, and require the work to be done according to a contract into which the parties had never entered. The Chief of the Bureau did right *551 in making changes conducive to the public interest, but he could not make these changes at the cost of the other contracting party. On the 30th of June, 1893, he decided “that this sandstone for the dock should be out of the best to be obtained.” That may have been a judicious and necessary decision, and it is not for the court to question it, but the best sandstone which could be obtained was not the stone prescribed by the contract.
The court does not intend to pass upon the issue whether the one stone was better than the other, or whether either or both were sufficient for the uses and purposes to which the stone might be put. It is incontrovertible that either the engineer in charge or the Chief of the Bureau was the person to determine this question, and the resulting question as to which was the proper person is one of law. In the absence of fraud, collusion, or gross mistake the decision of the proper arbitrator was final and conclusive. There is no fraud or collusion in the case, and the court is entirely satisfied that the engineer in charge acted with due care and caution, and that his decision was the exercise of his best judgment.
The contracts between the claimants and their subcontractors have been brought into the case by both parties, and the defendants rely upon them as being to some extent a defense to the claimants’ demand for damages.
But since the decision in the'leading American case of Masterton v. Mayor of Brooklyn (7 Hill N. Y. R.., 61), it has been held generally and also by this court that such subcontracts can not “be taken into the account, or become the subject-matter of consideration at all in settling the amount of damages to be recovered for a breach of the principal contract.” The defendants certainly were not a party to them and can neither be injured by them nor obtain an advantage from them. The rule for the measure of damages for breach of contract in such cases, where the contractor is not allowed to perform according to the terms of the contract, is too well settled to be either questioned or discussed.
The causes of action set'forth in Findings vix, ix, xi, and xii are sufficient, in the opinion of the court, to entitle the claimants to recover. As to the causes of action sot forth in Findings vm and x, the court is of the opinion that the *552 claimants should have submitted the requirements of the engineer in charge to the Chief of the Bureau before proceeding with the work. They were required to do so by the terms of the contract, and authority to compel them to do additional work was thereby reserved to the Chief of the Bureau.
The judgment of the court is that the claimants recover of the defendants $24,942.99.