Madden, Judge,
delivered the opinion of the court:
This action was brought pursuant to the Act of Congress, approved June 25, 1938, 52 Stat. 1197, conferring jurisdiction on the Court of Claims to hear, determine and enter judgment against the United States upon the claims of contractors who performed work or furnished materials on contracts with the United States entered into on or before August 10, 1933, and whose costs were increased as a result of the enactment of the National Industrial Recovery Act. There are five contracts involved, each of which is set forth in a separate count in plaintiff’s petition. With respect to Counts II, IV, and V there is no dispute as to plaintiff’s right to recover nor the amount of recovery. The disagreement between the parties relates to the two transactions covered by Counts I and III. Count I involves a contract for the construction of a floating drydock to be delivered at Philadelphia, Pa., and Count III a contract for the construction of a power house, lock, dam and other facilities on the Kanawha River, near London, West Virginia.
The Philadelphia contract was made on March 9, 1933, and the work was completed on or about September 11, 1934. The defendant paid the Company the agreed price of $369,892.45. The Company incurred increased labor costs, as to $52,027.44 of which defendant concedes plaintiff is entitled to recover. As to $6,692.95, the parties are in disagreement. The circumstances are as follows.
*758 The contract for the drydock permitted a maximum work week of 48 hours. In fact, a work week of 44% hours prevailed at. the Company’s Wilmington plant, where the work was done, until November 27, 1933. A Code of Fair Competition for the Shipbuilding and Ship Repair Industry was approved by the President pursuant to Title I of the National Industrial Recovery Act on July 26, 1933. It provided for a maximum work week of 32 hours on government work and 36 hours on nongovernment work, and set the same minimum hourly wages for both kinds of work. The Company on November 27,1933, reduced its hours on the drydock job to 32, and increased the hourly wages to the code minimum. Because of the reduced hours, the weekly wages were 6% less than they had been before.
The wage level in the area generally went up. The Public Works Administration of the defendant awarded shipbuilding contracts to another contractor whose yard adjoined the Company’s and stipulated for wages higher than those required bj' the Code minimum and paid by the Company at its Wilmington plant. The Company’s employees working on the drydock job became dissatisfied and on February 13, 1934, struck for higher wages. A conciliator from the United States Department of Labor studied the situation and proposed to the parties a new wage schedule which was accepted and put into effect on March 4, 1934, when work was resumed. This wage schedule cost the Company $6,692.95 in additional wages in the completion of the contract.
We think that the $6,692.95 was not “increased costs incurred as a result of the enactment of the National Industrial Recovery Act” within the meaning of the 1938 act here relied upon. If Congress meant in the 1938 act that such general occurrences as increases in the cost of living and the surrounding wage level, creating dissatisfaction with their income among the employees of one employer, were to be regarded as a compensable “result” of the enactment of the National Industrial Recovery Act, practically every wage increase occurring during the period here in question, anywhere in the country where government work was done, would come within the scope of the statute. But these *759 occurrences accompany in greater or less degree every improvement in business conditions. It was no doubt the purpose of the National Industrial Recovery Act to bring about such an improvement, and hence plaintiff may logically argue that where there is a purpose, a result in accordance with that purpose cannot be disclaimed. But even though the Recovery Act be given credit for the improved business conditions, and the improved business conditions be regarded as the cause of the Company’s employees’ demand for higher wages, we still have to determine whether Congress intended that a secondary consequence of the Recovery Act, such as this, should be compensated. We think not. We think rather that Congress intended the “result” to be compensated to be the legal result, determined by the usual principles of legal cause and legal liability. These are elusive enough, at best, but they would not permit a conclusion that government activity designed to improve economic conditions was the legal cause of a strike for higher wages.
The conduct of the conciliator of the Department of Labor in proposing an increase in wages for the purpose of settling a strike of the Company’s workers was not attributable to the National Industrial Recovery Act. It was a normal activity of another unit of the United States Government. The award by the Public Works Administrator to a neighboring shipbuilder of a contract stipulating a higher minimum wage than that paid by the Company presents a more troublesome problem since the Public Works Administration was created under Title II of the National Industrial Recovery Act. Nevertheless we do not believe that Congress, in the 1938 Act, meant that an increase in the wage bill of another employer with whom the Public Works Administration had no dealings was to be compensated merely because that Administration’s activity was one of several factors contributing to the dissatisfaction and the strike which brought about the increase.
The claim covered by Count III of plaintiff’s petition relates to the London, West Virginia, contract. The contract was made November 26, 1932, and the work was completed on or about June 25, 1934. The defendant paid the *760 Company, or credited it with, the contract price of $1,722,047.66. In completing the contract, the Company incurred increased labor costs of $57,195.78 after August 10, 1933. The defendant concedes that not less than $23,485.46 of that sum was incurred in such circumstances as to be compensable under the 1938 Act. The disputed balance of $33,710.32 may be divided as follows: (1) The amount in excess of 40 cents per hour paid to labor in the minimum wage group after a raise given September 16, 1933; (2) the amount of addition to wages of employees other than those in the minimum wage group after a raise given on the same date.
The Company executed the President’s Reemployment Agreement for the construction industry July 31, 1933, and his modified agreement September 2, 1933. The July 31 agreement excepted the London operation from its provisions, but the September 2 agreement did not. The defendant concedes that the Company was required by the agreement to raise its minimum wages to 40 cents per hour.
One provision of the President’s Reemployment Agreement (section 7) was a promise on the part of the Company “not to reduce the compensation for employment now in excess of the minimum wages hereby agreed to (notwithstanding that the hours worked in such employment may be hereby reduced) and to increase the pay for such employment by an equitable readjustment of all pay schedules.”
Shortly after the enactment of the National Industrial Recovery Act of June 16, 1933, the defendant entered into negotiations with contractors doing construction work for it, looking toward supplementary agreements changing existing contracts to make them conform to the wage and hour provisions of that Act, and reimbursing the contractor for increased costs caused thereby. Such negotiations between defendant’s contracting officer and the Company relative to the London job began before June 30, 1933. On that date the contracting officer proposed, and on July 31 the Company rejected, a supplemental agreement increasing from 30 cents to 35 cents an hour the wages of the minimum wage group. The Company’s stated reason was that if it increased the wages of that group, it would be obliged to make *761 ■-corresponding increases in the wages of its other employees, and would thus have to make an outlay much larger than that compensated by the proposed agreement.
On July 18 the Company at the request of the contracting ■officer submitted an estimate of increased hourly wage rates which it would pay if it completed the contract under the ■provisions of the Recovery Act. On July 25 a revised supplemental agreement prepared by the contracting officer was submitted by him to the Company, and, within the following few days executed by him, the Company and its ■sureties and transmitted to the Chief of Engineers for approval. This agreement set forth a continuation of the thirty hour week and a schedule of increased rates of pay for all classes of labor on the London job, common labor •/being increased from 30 to 45 cents, and other classifications •receiving increases ranging from five cents an hour for one ■grade of mechanics to twenty eight cents an hour for electricians.
On July 31 the contracting officer telegraphed the Com-pany that the supplemental agreement would not, for the present, be approved by the Chief of Engineers and ■advised it to “take no steps toward putting your work on •minimum wage or reduced hour basis until agreements are approved.” The Comptroller General of the United States -on August 11 issued a ruling in another case that contracting officers had no authority to increase the compensation provided for in existing contracts. On August 24 the -Attorney General of the United States rendered a written -opinion to the President in which he advised that heads of executive departments and independent agencies could, in -consideration of a contractor’s adherence to and compliance •with a code or with the President’s Reemployment agree■ment, make a binding agreement to reimburse the contractor for resulting increased costs.
Though negotiations for the supplemental agreement continued, the agreement was never approved by the Chief of Engineers. About September 16, 1933, the Company increased the wages of employees at the London project in -.the .amounts .set forth in the supplemental agreement. The *762 Company wrote the Chief of Engineers on September 16,. advising him of its action, referring to the President’s Reemployment Agreement and stating its opinion that the defendant was obligated to reimburse the Company for the-resulting increased costs. It similarly advised the contracting officer. On September 22 the Acting Chief of Engineers-wrote the Company expressing the gratification of the department on behalf of the administration, but advising that the question of reimbursement was still unsettled and under-consideration by the administration. On October 17, 1933;,. the contracting officer wrote the Company that it had been definitely determined that the terms of the contract would', not be changed.
Our question, as we have said, is whether the Company-is entitled to be compensated for the extra five cents per hour which it added to the wages of its unskilled labor, or for any of the increases which it made in wages in classifications above the unskilled grade.
The Company signed the President’s Reemployment Agreement. It therein agreed that it would pay a minimum wage of not less than 40 cents an hour (section 6)] and would work its employees not more than 35 hours a week (section 3). The Company was limited by its London contract to a thirty-hour work week and it set a minimum-wage of 45 cents an hour there to produce approximately the same weekly wage which the maximum work week at the minimum wage would produce. The minimum rate of 40 cents for a thirty-hour week would have produced a. weekly wage substantially below the prevailing wage in the area.
As to the other classifications of employees above the lowest wage group, the Company had agreed, when it signed the President’s Reemployment Agreement, that it would “increase the pay for such employment by an equitable readjustment of all pay schedules.” This promise, though-vague, was intended to be binding, and the defendant cannot say that the Company should have disregarded it. As to whether the increases were “equitable,” it will be remembered that they were proposed by the defendant’s contract *763 ■ing officer at a time when he supposed that the defendant was going to have to pay for them. They were not indiscriminate, but varied widely as to the different classifications, showing an apparent effort to make a nice adjustment, though the men in the classification receiving small increases would certainly be critical of the differentials.
We are aware that there entered into the Company’s decision elements in addition to enthusiasm for the Recovery Act. Among other things it hoped to stop the rapid turnover in its labor force at London. It also hoped, and for a. time may have expected, that the defendant would} pay the increased costs by a modification of the contract. But these facts are, we think, immaterial. What is material is that the Company, having agreed to take certain steps to comply with the Recovery Act, took steps which purported to be in that direction and which are not shown to have deviated greatly from that direction. We think that the increased wage costs at London were “incurred as a result of the enactment of the National Industrial Recovery Act.”
The defendant urges that the 1938 Act intends only to compensate for increased costs resulting from the enactment of Title I of the National Industrial Recovery Act. It bases this argument on the language of the proviso in the 1938 Act which is as follows:
Provided, That (except as to claims for increased costs incurred between June 16, 1933, and August 10, 1933) this section shall apply only to such contractors, including completing sureties and all subcontractors and materialmen, whose claims were presented within the limitation period defined in section 4 of the Act of June 16, 1934.
•It urges that since the 1934 Act, 48 Stat. 974, U. S. Code, Title 41, secs. 28-33, had been limited to increased costs incurred by reason of compliance with a Code of Fair Competition, or with the President’s Reemployment Agreement, both of which were contained in Title I of the Recovery Act, the proviso in the 1938 Act shows that it was intended to be similarly limited.
There is some basis for this argument. The fact that suits could not, in general be brought under the 1938 Act *764 except where claims had been filed under the 1934 Act is some' indication that Congress was thinking of the two acts as having similar scope. We think, however, that this evidence of intent is not sufficient to overcome the broad and unqualified language of the 1938 Act. The fact that the language of the 1934 Act was limited to Title I and the language of the 1938 Act was not urges strongly against the narrow interpretation. Even if the argument were valid, the Company here was acting in purported compliance with the President’s Reemployment Agreement as well as with Section 206 of Title II, and can, therefore, claim the benefits of the 1938 Act.
Plaintiff, on Count III, is entitled to recover $57,195.78. On Count I it is entitled to recover $52,027.44. The amounts due under Counts II, IY, and V total $33,256.37. Plaintiff is entitled to recover in all the sum of $142,479.59. It is so ordered.
■Jones, Judge; Littleton, Judge; and Whaley, Ohief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.
JUDGMENTS ENTERED
On March 12, 1941
In accordance with the provisions of the Act of June 25, 1938, on motion of the several plaintiffs (to which no objection had been filed by the defendant), and upon the several stipulations by the parties, and in accordance with the recommendation of a commissioner in each case recommending that judgment be entered in favor of the plaintiffs in the sums named, it was ordered that judgments be entered as follows, for increased costs under the National Industrial Recovery Act:
No. 44288. Knoxville Iron Company_$2,374.78
No. 44332. Southern Ornamental Iron Works_ 102.82
No. 44384. The Miller Bros. Pen Co_ 1, 095. 47
*765 PETITIONS DISMISSED
Cases under the Act of June 25, 1938, in which petitions were dismissed.
On Makoh 3, 1941
44132. The American Rolling MiE Oo.
44177. A. S. Sehulman Electric Oo., a Corporation. 44329. Hewitt Rubber Corporation, a Corporation. 44397. General Bronze Corporation.
44436. Penn Metal Co. of Penna.
44550. R. C. A. Manufacturing Company, Inc.
On APRIL 7, 1941
44225. Clyde E. Speer Coal Co.
44227. A. J. deKoning.
44328. Jacob Hyman et al.
44576. Atlantic Marble & Tile Co.