**BEUTTAS et al. v. UNITED STATES.**

No. 44978.

Court of Claims.

June 5, 1944.

P. J. J. Nicolaides, of Washington, D. C. (William F. Kelly, of Washington, D. C., on the brief), for plaintiff.

Donald B. MacGuineas, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiffs sue to recover extra costs incurred due to a suspension of the work for 69 days during which a change in the plans and specifications was being considered. It is stipulated that they are entitled to recover $8,727.44 on this account.

They also sue to recover for increased wages which they were required to pay common laborers, carpenters, cement finishers, and hoisting engineers.

Plaintiffs had a contract for the construction of the foundations of the Jane Addams Houses in Chicago. It was a relief project; it was intended to relieve unemployment, to provide a living wage for laborers and so to increase their purchasing power. What a living wage was, was fixed by the contract. The contractor was required to pay a minimum wage for common laborers of 82½ cents an hour, and for carpenters, cement finishers, and hoisting engineers of $1.31¼ cents an hour. It was recognized, however, that the cost of living might increase during the progress of the work or for some other reason that the Government might find it desirable that even higher wages should be paid, and so it was provided in article 19 of the specifications that if the Federal Emergency Administrator of Public Works "establishes different wage rates, the contract price shall be adjusted accordingly. * * *"

The contract was entered into on November 26, 1935, but defendant held up the

work until February 17, 1936, when it gave plaintiffs notice to start work; however, work was not begun until February 28, 1936, due to bad weather. While the work was under suspension the defendant on February 15, 1936, asked for bids on the construction of the building above the foundation. (Plaintiffs' contract was for the foundation only.) This advertisement for bids required bidders to pay a minimum wage to the before-mentioned laborers higher than was provided for in plaintiffs' contract. A successful bidder on this part of the building could not pay common laborers less than 95 cents an hour, instead of the 82½ cents on the foundation contract, and could not pay carpenters, cement finishers, and hoisting engineers less than $1.50 per hour, instead of the minimum of $1.31¼ on the foundation contract.

Whereas on November 26, 1935, the Government thought not less than $1.31¼ was a fair wage for carpenters, cement finishers, and hoisting engineers, and 82½ cents for common laborers, by February 15, 1936, conditions had changed to such an extent that it no longer considered these fair wages and demanded of the superstructure contractor the payment of higher wages.

Plaintiffs' work did not commence until after this change in the wage rate. So, when they offered to pay their carpenters, cement finishers, and hoisting engineers $1.-31¼ and common laborers 82½ cents, these men very naturally said, no, the Government has said that no less than $1.50 and 95 cents is fair; and when plaintiffs would pay no more, they struck. In order to induce them to work plaintiffs had to pay the $1.50 and 95 cents.

All the proof goes to show the laborers would not have struck except for the Government's action in establishing a higher minimum wage on the very same building on which plaintiffs' laborers were employed.

That they should have struck was well-nigh inevitable. They had no contract with plaintiffs to work at any fixed wage and, so, when their Government said that the least that ought to be paid for such labor was more than plaintiffs offered, of course they demanded the amount fixed by the Government as fair and refused to work for less.

So, while the defendant did not expressly demand of these plaintiffs that they pay a higher minimum wage on their contract, it nevertheless brought about conditions that made this almost inevitable, and it must have known that this would be the necessary consequence of its act. Just as effectively as though it had directly ordered plaintiffs to pay a higher wage, it indirectly required them to do so.

In LeVeque et al. v. United States, 96 Ct.Cls. 250, we held that the establishment by the Government of higher wages on another project in another part of the city did not require it to pay plaintiffs the increased wages they had to pay on their project. In that case we concluded the increase in wages paid by plaintiffs was not a necessary result of defendant's act. Here we think it was. The increased wages in this case were on the very same building on which plaintiffs were working. The Administrator did not directly establish different minimum rates to be paid by plaintiffs, but this was the necessary consequence of what he did. He did indirectly that which if done directly would have rendered the Government liable. We are of opinion that the defendant in fact established different wage rates on plaintiffs' job, and, therefore, it is obligated to pay the increase under article 19.

But whether or not this is so, it is an implied condition of every contract that neither party will hinder the other in his discharge of the obligations imposed upon him, nor increase his cost of performance. Restatement of the Law of Contracts, sec. 315(1); Williston on Contracts, sec. 1293A; Anvil Mining Co. v. Humble, 153 U.S. 540, 551, 14 S.Ct. 876, 38 L.Ed. 814. It was an implied condition of this contract that the Government would not do any act that as a necessary consequence would make performance by the plaintiffs more expensive. The Government breached that implied condition by increasing the minimum wage to be paid on a part of this building, which as a necessary consequence required plaintiffs to pay more wages than those specified.

It follows that the defendant is liable for the increased wages plaintiffs had to pay.

It is said, however, that the contracting officer and head of the department have decided that the Government has fully performed its obligations under the contract, and that this decision is final under article 15 of the contract and that, therefore, this court has no jurisdiction to determine the matter.

The defendant's position, otherwise stated, is that the parties agreed in advance of the dispute to waive their right to sue for this breach of the contract and to leave the final determination of the controversy to the decision of one of the contracting parties.

We do not think the parties intended article 15 to have such broad scope. If they did, it is clearly illegal under numerous decisions of the Supreme Court of the United States and of other Federal courts and of the State courts. It has long been settled that any agreement made in advance of the controversy which deprives a party of recourse to the courts is contrary to public policy and, therefore, void. Home Ins. Co. v. Morse, 20 Wall. 445, 450, 22 L.Ed. 365, et seq.; Doyle v. Continental Ins. Co., 94 U.S. 535, 537, 24 L.Ed. 148; Guaranty Trust & Safe Deposit Co. v. Green Cove R. R., 139 U.S. 137, 142, 11 S.Ct. 512, 35 L.Ed. 116; Martin v. Baltimore & O. R. R., 151 U.S. 673, 684, 14 S.Ct. 533, 38 L.Ed. 311; Terral v. Burke Construction Co., 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352, 21 A. L.R. 186. See also cases cited in 13 Corpus Juris, p. 455, notes 3, 5 and 8; 17 C. J.S., Contracts, § 229, p. 603, notes 58–66.

In Insurance Co. v. Morse, supra, there was involved a statute of Wisconsin which imposed on foreign insurance companies, as a condition to doing business in the State, an agreement to submit to the exclusive jurisdiction of the Wisconsin courts and to forego removal of a case to the Federal courts. It was held that the statute was unconstitutional and void, because "a man may not barter away his life or his freedom, or his substantial rights."

The statement of this principle was somewhat amplified in Doyle v. Continental Ins. Co., supra, in commenting on the Morse decision. It was there said, 94 U.S. on page 538, 24 L.Ed. 148:

"It was held, first, upon the general principles of law, that although an individual may lawfully omit to exercise his right to transfer a particular case from the State courts to the Federal courts, and may do this as often as he thinks fit in each recurring case, he cannot bind himself in advance by an agreement which may be specifically enforced thus to forfeit his rights. This was upon the principle that every man is entitled to resort to all the courts of the country, to invoke the protection which all the laws and all the courts may afford him, and that he cannot barter away his life, his freedom, or his constitutional rights."

The majority of the court, however, held that, while a State could not impose this condition on an insurance company's entering into business, it nevertheless had the right to revoke its license, even though a breach of the condition may have been the reason for the revocation. Justices Bradley, Swayne, and Miller dissented on the ground that the same reason that prevented the imposition of such a condition prevented the revocation of the license for its breach. Both the majority and minority agreed, however, that a condition in a contract prohibiting resort to a tribunal otherwise having jurisdiction of the subject matter and the parties was illegal.

Fifty years later, this view was approved by the Supreme Court in the case of Terral v. Burke Construction Co., 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352, 21 A.L.R. 186, and we understand it to be the law today. Section 558 of Restatement of the Law of Contracts reads:

"A bargain to forego a privilege, that otherwise would exist, to litigate in a Federal Court rather than in a State Court, or in a State Court rather than in a Federal Court, or otherwise to limit unreasonably the tribunal to which resort may be had for the enforcement of a possible future right of action or the time within which a possible future claim may be asserted, is illegal."

It is true that it is not uncommon in construction contracts for the parties to agree that the decision of the architect or engineer shall be final on such questions as the proper interpretation of the plans and specifications, whether or not the work or materials comply with the specifications, the measurement of the work done, causes and extent of delay, and similar matters of fact (e. g., see Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106; Sweeney v. United States, 109 U.S. 618, 3 S.Ct. 344, 27 L.Ed. 1053; Martinsburg & Potomac R. R. Co. v. March, 114 U.S. 549, 5 S.Ct. 1035, 29 L.Ed. 255; United States v. Gleason, 175 U.S. 588, 20 S.Ct. 228, 44 L.Ed. 284; Ripley v. United States, 223 U.S. 695, 750, 32 S.Ct. 352, 56 L.Ed. 614; Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342; United States v. Mason & Hanger Co., 260 U.S. 323, 43 S.Ct. 128, 67 L. Ed. 286); but provisions leaving to the final judgment of the engineer or archi-

tect the question of whether or not there has been a breach of the contract and preventing resort to the courts for a determination of that question and for enforcement of rights thereby accruing have never been upheld. For instance, in Guaranty Trust Co. v. Green Cove R. R., supra, a provision of a trust deed agreeing not to resort to the courts for its enforcement was held invalid on the authority of a number of English and State cases there cited.

Even arbitration agreements, not authorized by statute, leaving to arbitrators the final determination of whether or not there has been a breach of the contract, are illegal, but parties may legally agree on arbitration to determine facts upon which a duty depends. See Restatement of the Law of Contracts, secs. 550 and 551; Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 120, 121, 44 S.Ct. 274, 68 L.Ed. 582.

Here the agreement, as construed by the defendant, is to leave the settlement of the dispute, not to arbitrators, but to an agent of one of the parties. It is an agreement to leave to the party who made the contract the determination of whether or not it had breached it.

If Article 15 is to be given such a broad scope, then an aggrieved contractor is denied access to this court save only in those cases where the decision of the contracting officer on whether or not he has breached his contract is arbitrary or capricious or so grossly erroneous as to imply bad faith. Such an agreement would be contrary to the Act of Congress giving its consent that the United States might be sued. On February 24, 1855, 10 Stat. 612, Congress passed an Act creating the Court of Claims and said, "the said court shall hear, and determine all claims founded upon * * * any contract, express or implied, with the government of the United States. * * *" (Italics supplied.) This provision is the law today. Section 145 of the Judicial Code; sec. 250, Title 28, U.S.C., 28 U.S. C.A. § 250. It was the law when this contract was entered into. Can it be said that it was in the power of any officer or agent of the Government to set aside this Act of Congress and to say that the contracting officer, and not the Court of Claims, "shall hear and determine all claims founded upon [this] contract"? Such a provision is contrary to the law established by Congress and, therefore, is void.

Not only is it beyond the power of a party to bargain away this right given by Congress, but it must be borne in mind that bidders on this work were forced to enter into this sort of an agreement. The Government contends that as to this project this governmental agency said, the right given by Congress to sue in the Court of Claims is hereby taken away; an aggrieved contractor can secure redress only by appealing to the contracting officer; he will decide whether or not we have paid you all we promised to pay.

This would be a shocking demand; Barlow et al. v. United States, 35 Ct.Cl. 514, 546; we do not believe the government intended to make it. We are of opinion that they intended to demand only that the contracting officer should decide questions of fact arising as the work progressed, such as the proper interpretation of the requirements of the contract documents, the fitness of the materials, and the sufficiency and amount of the work, etc. Article 15, providing for decisions by the contracting officer, concludes, "In the meantime the contractor shall diligently proceed with the work as directed." This clearly indicates they had in mind only those disputes that arose during the progress of the work. It negatives the idea that after the contractor had done all the work required of him, the contracting officer should decide whether or not he had been paid all he was entitled to.

We are of opinion the defendant is liable for increased wages paid by the plaintiffs in the amount of $4,660.83. On the whole case plaintiffs are entitled to recover the sum of $13,388.27. Judgment for this amount will be entered. It is so ordered.

WHALEY, Chief Justice, concurs.

MADDEN, Judge (concurring).

In my opinion, the case should be decided upon the ground that, whether or not the express provision of Article 19 was applicable, the Government, like any other contractor, impliedly agrees that it will not by its acts increase the cost of performance of the contract by the other party. We need not consider the effect of acts of the Government in its sovereign capacity, such as increasing taxes, or setting wages or hours by laws of general application. Here the act complained of was the setting of wages on one specific job, which was the superstructure to be built on the foundation which the plaintiff had contracted to build.

The Government breached this term which we read into the contract because it is fair and the parties to the contract must have intended it. Yet the Government urges that Article 15 of the contract gave the Contracting Officer the power to read this term out of the contract, by deciding that the plaintiff was not entitled to a remedy for its breach. I think there are two objections to this argument.

(1) There is no indication that the Contracting Officer ever made a decision or gave any consideration to such a term of the contract, or was aware that it contained any such term. This fact points to one of the difficulties that would be created by lodging in a contracting officer, nearly always a layman, the power to decide a question which cannot be decided without an understanding of the way in which the law has traditionally interpreted the texts of writings which appear in litigation. The consequence would be an interpretation which would stick in the letter of the contract, and fail to reach its real meaning and equity. I think, therefore, that the Contracting Officer never decided the question which we are called upon to decide.

(2) I think that the parties never intended that the Contracting Officer should have the power to decide the question which we have before us, i. e., the question of whether or not the Government breached its contract. In spite of the broad language of Article 15 of the contract, it must be that there are limits to its scope. In fact, the evidence in cases before us shows frequent examples of situations in which the Contracting Officer has disclaimed any power to decide that the contractor is entitled to compensation for unreasonable delay caused by acts of the Government. He knows that his decision would be substantially meaningless, since he could not award compensation, except by the expedient of covering it into some change or adjustment which he is authorized to make as the contracting agent for the Government. So he advises the contractor to seek relief from the Comptroller General first and, if he does not get it there, from this court. The Comptroller General, whose powers are somewhat undefined and whose expenditures are, so far as the Government is concerned, practically unreviewable, sometimes gives relief. If he does not, the contractor may come to this court, and the Government may not urge that his case is concluded by a decision made somewhere else, since the Contracting Officer made no decision at all, and the Comptroller General's decision does not, either by the contract or by law, foreclose resort to this court.

Since the Contracting Officer cannot make a decision, effective against the Government, that the Government has breached its contract, and since, if he did so, we would not be bound by it, he frequently does not decide the question at all if his decision would be against the Government. This means that, in practice, the contractor, if he meant, by agreeing to Article 15, to lodge in the Contracting Officer the power to decide questions of breach of contract, has given that official power to decide cases against him, but no power to decide cases, effectively, in his favor. No contractor in his right mind would ever intend to do that. And no Government official, in drawing a contract, would intend to include in it such an unconscionable provision. And if both of them did, with their eyes open, intend any such agreement, we would feel bound to conclude that the law permitting Government agents to make contracts, and the statutes giving to a victim of the Government's breach of contract the right to sue in this court, do not authorize an agent of the Government to defeat that right by making such an unconscionable bargain about it. I therefore agree with the court that Article 15 was not intended to give to the Contracting Officer the power of decision which the Government claims for him, and that we are not foreclosed from deciding the case.

I recognize that, under Article 15 and other provisions of the standard Government contract, many matters of vital consequence to the contractor may be decided by the Contracting Officer without effective review by this court. The consequences are sometimes, in our opinion, harsh and unjust to the contractor. And the line between what the Supreme Court and this court have sanctioned in those cases, and what we refuse to sanction here may not always be easy to draw. But what the Government here urges, the power in the Contracting Officer to decide the ultimate question of whether his principal has breached its contract, should not be tolerated.

LITTLETON, Judge (dissenting in part).

I dissent as to the allowance of any part of the sum of $4,660.83 (finding 13) on account of increased wages.

In support of their claim for the recovery of these increased wages plaintiffs insist that section 12, Division 1, of the specifications and article 18(a) of their contract (finding 5) fixed the wages that they were to pay under the contract and that, by article 19(a), the Government agreed to reimburse them by adjustment of the contract price in the event the Administrator of Public Works established different wage rates. They further insist that the Administrator did establish higher wage rates within the meaning of the provisions of the contract and specifications mentioned. I cannot agree. The wages specified in plaintiffs' contract were minimum rates only. Article 19(a) of the contract and paragraph 4 of section 12 of the specifications contemplated, I think, that the Government would increase plaintiffs' contract price only in the event the Administrator established greater minimum wage rates under their contract and directed them to pay wages at such increased rates. The "project," referred to in art. 19(a), was the foundation work and not the buildings which the Government might, under another contract, erect thereon. Each P. W. A. contract made was given a project number, and plaintiffs' contract was "Project No. H–1405." The Administrator did not establish greater minimum wage rates under plaintiffs' contract nor on the "project" covered thereby, nor did he direct or otherwise directly force them to pay any increased wages. He did nothing except what he had a perfect legal right to do so far as plaintiffs' contract was concerned. Perhaps he should not have advertised for another contract at higher minimum wages, which would result in a higher bid price to the Government, until plaintiffs had finished their contract which was closely related to the new work, but this was not a breach of any express or necessarily implied provision of their contract and cannot be made the basis of a claim for reimbursement under art. 19(a). Dravo Corporation v. United States, 93 Ct.Cl. 734. Moreover, section 12 of the specifications provided that the Government would not consider any claims for additional compensation because of payment by the contractor of any wage rate in excess of the applicable rate contained therein, and that all disputes with labor in regard to payment of wages in excess of those specified "shall be adjusted by the contractor." This provision appears to have contemplated an

event such as actually happened, i. e., a strike for higher wages.

The minimum wage rates set forth in plaintiffs' contract were fixed by the Administrator of Public Works in the invitation for bids and specifications for the particular project covered by that contract under the Rules and Regulations approved by the President December 26, 1934, issued under authority of section 209, Title II of the National Industrial Recovery Act, and Executive Order No. 6929, which Regulations, so far as material here, were as follows:

"Whereas, the President, by Executive Order No. 6929, of December 26, 1934, has delegated to the Federal Emergency Administrator of Public Works the power * * * to prescribe new rules and regulations * * * I hereby prescribe the following rules and regulations under the authority of the said section 209 as necessary to carry out the purposes of said Act, which rules and regulations shall apply to all projects constructed in whole or in part under Title II of said Act: * * *

"3. Wages. The wages paid to employees directly employed on any such project shall not be less than the applicable minimum wage rates which the Administrator may fix from time to time. Should it appear that any individual employed on any such project has been or is being paid less than the minimum wage fixed by the Administrator and in force at the time such labor was performed, the employer of such individual shall be notified to pay him all wages due according to the prescribed rate. Upon ten days' default on the part of any such employer after the receipt of such notice he shall be subject to the penalties provided in said Act for violation of these regulations."

The actual increased wages of $4,321, which plaintiffs incurred, were incurred and paid as a direct result of a demand and strike of their Union employees. Except for this, plaintiffs would not have been required by the Administrator, or otherwise, to pay any increased wages. Defendant did not request plaintiffs to increase the wage rates and no one representing the Government or the Administrator participated in the dispute between plaintiffs and the labor unions. The fact that the labor unions of the Chicago territory may have failed to abide by their wage agreement with the Building Trade Employers' Association, of

which plaintiffs were members, cannot be made the basis of a claim for reimbursement against the Government. Nor can the Government be held liable to plaintiffs for reimbursement of the increased wages which they were compelled to pay under the circumstances, because the Government on February 15, 1936, issued invitations for bids and specifications for another contract on another and a different project for the buildings to be constructed on the foundations covered by plaintiff's contract in which minimum wage rates higher than those contained in plaintiffs' contract were specified. The provisions of plaintiffs' contract did not expressly cover such a situation, and the language used in art. 19(a) and paragraph 12 of the specifications cannot be so extended as to include it by implication. LeVeque et al. v. United States, 96 Ct.Cl. 250; Hood & Gross v. United States, 90 Ct.Cl. 258, 265; Barnes v. United States, 92 Ct.Cl. 32, 43, 44. Cf. Blair v. United States, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039.

Art. 15 of the contract made the decisions of the contracting officer and the head of the department final on such questions. They both considered and rendered adverse decisions on the question whether the Administrator had established different wage rates in such a way as to require reimbursement to plaintiffs for the increased wages which they paid. This was clearly a "dispute concerning questions arising under this contract" and their decisions were final under the express agreement of the parties. These decisions were clearly not arbitrary, and they were clearly not so grossly erroneous as to imply bad faith. We cannot, therefore, ignore them. Ripley v. United States, 220 U.S. 491, 31 S.Ct. 478, 55 L.Ed. 557; Id., 222 U.S. 144, 147, 32 S.Ct. 60, 56 L.Ed. 131; Id., 223 U.S. 695, 696, 701, 702, 32 S.Ct. 352, 56 L.Ed. 614; Burchell v. Marsh, 17 How. 344, 349, 350, 15 L.Ed. 96.

Defendant makes the contention that plaintiffs did not appeal from the decision of the contracting officer to the head of the department. This contention appears to be based on the assumption that the Assistant Administrator was the contracting officer. Plaintiffs did appeal, and within time. Under the contract provisions the Director of Housing, A. R. Clas, was the contracting officer, as the Assistant Administrator stated in his decision of June 29, 1926. The Assistant Administrator of Public Works,

Horatio B. Hackett, although he signed the contract, was the head of the department within the meaning of the contract as defined by article 28(a). He was duly authorized to act for the Administrator and he did so act with reference to approval of change orders and consideration and decisions of appeals.

Plaintiffs make the alternative claim that even if their claim for reimbursement of the increased wages, as such, should be denied they should have judgment for at least $909 on account of such wages (they claim the amount should be $1,856.08) under the findings and recommendations of the Assistant Administrator in his letters of June 29 and August 12, 1936, to plaintiffs and in the letter of the Administrator of May 20, 1937, to the Comptroller General (finding 18). These officials decided in connection with plaintiffs' claims for extra costs that the expenses necessarily incurred by plaintiffs, including a portion of the increased wages, as a result of the stoppage and suspension of their work from December 10, 1936, to February 17, 1937, in connection with changes could not be allowed by them as an increase in the contract price as a part of an equitable adjustment under art. 3 of the contract in connection with the change order. This position appears to have been taken because of certain rulings of the Comptroller General. See 7 Comp.Gen. 645; 12 Comp. Gen. 179, 227. They therefore made findings with reference to the amounts and the cause of these expenses, and recommended to the Comptroller General that certain amounts be paid. While these findings and recommendations should be given great weight if the items covered thereby are found by the Court to be allowable, either under the contract or as damages for a breach thereof, they are not such decisions as are made final and conclusive by art. 15 for such purposes. The evidence of record does not warrant a finding by the Court that of the total increased wages paid by plaintiffs the amount of $1,556.06, or $909 thereof, was incurred as a result of delay due to suspension of the work for 69 days in connection with the change under the contract as mentioned in the findings.

I think judgment should be entered in favor of plaintiffs for only $8,727.44.

JONES, Judge, took no part in the decision of this case.