# YORK ENGINEERING & CONSTRUCTION CO. v. UNITED STATES.

## No. 45282.

Court of Claims.

Feb. 5, 1945.

On Motion for New Trial June 4, 1945.

LITTLETON, Judge, dissenting in part.

WHITAKER, Judge, dissenting from denial of new trial.

———◆———

This case having been heard by the Court of Claims, the court, upon the evidence and the report of a commissioner, makes the following special findings of fact:

1. The York Engineering & Construction Company, hereinafter referred to as the plaintiff, is a partnership engaged in the contracting business, in which R. W. Smith and S. W. Harbold are equal partners.

2. On August 5, 1935, plaintiff and the United States entered into an agreement designated ER–W1101–eng.–3 by the terms of which plaintiff agreed to furnish all materials and do all the work necessary for the construction of lock and Dam No. 9, Allegheny River, and alterations to Dam No. 8, Allegheny River, in strict accordance with the drawings, specifications and conditions of the agreement for which work the United States agreed to pay plaintiff $1,822,184.74 (estimated), and to pay such increased amounts or to make such deductions as the parties might be entitled to under the terms of the agreement. A copy of the contract and specifications have been admitted in evidence as plaintiff's exhibit 2, and are made a part hereof by reference. The contract provided that work should be commenced within ten calendar days after receipt of notice to proceed and should be completed within 450 calendar days after date of notice to proceed. Plaintiff received notice to proceed September 25, 1935.

During the several years the contract work was being done the contract was modified by nineteen change orders pursuant to which the contract price was increased and the time for completion was extended 468 calendar days, making the revised date of completion March 31, 1938. Thereafter, on appeal to the Chief of Engineers, plaintiff was allowed 189 additional days, i. e., to October 6, 1938, and completion of all the work under the contract was accepted on or before that date. By reason of the last extension of time, liquidated damages in the sum of $50,375 which had been deducted were excused and paid to plaintiff.

3. The contract provided among other things as follows:

"Art. 9. Delays—Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor's right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible

to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, insufficient supply of qualified labor from offices designated by the United States Employment Service, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes: Provided further, That the contractor shall within 10 days from the beginning of any such delay notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned, or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.

"Art. 15. Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto as to such questions. In the meantime the contractor shall diligently proceed with the work as directed.

"Art. 18. (a) The contractor and all subcontractors shall pay all employees directly employed on this work at the site thereof at not less than the wage rates set forth in the specifications. (The minimum wage rates therein established shall be subject to change by the contracting officer, and in the event different minimum wage rates are so established, the contract price shall be adjusted accordingly on the basis of all actual labor and compensation insurance costs on the project to the contractor, whether under this contract or any subcontract.)

"Art. 19. (a) Labor preferences.—With respect to all persons employed on projects, except as otherwise provided in Regulation No. 2, (a) such persons shall be referred for assignment to such work by the United States Employment Service, and (b) preference in employment shall be given to persons from the public relief rolls, and except with the specific authorization of the Works Progress Administration, at least ninety per centum (90%) of the persons employed on any project shall have been taken from the public relief rolls; Provided however, that, expressly subject to the requirement of subdivision (b), the supervisory, administrative, and highly skilled workers on the project, as defined in the specifications, need not be so referred by the United States Employment Service. * * *"

The specifications provided in part as follows:

"1–25. Claims and protests.—If the contractor considers any work required of him to be outside the requirements of the contract, or considers any record or ruling of the inspectors or contracting officer as unfair, he shall ask for written instructions or decision immediately and then file a written protest with the contracting officer against the same within 10 days thereafter, or be considered as having accepted the record or ruling. (See Articles 3 and 15 of the contract.)

"1–09 (d). Ice.—No exact information is available as to the extent of ice formation on the Allegheny River at the site, but in general, ice forms about the middle of December and the river usually stays frozen over until the first part of March. Numerous ice gorges usually occur along the river during the break-ups. It has been the practice with shipping interests to suspend navigation during the period of ice and withdraw floating plant to a safe harbor."

Paragraph 1–30(b) of the specifications set the minimum wage for unskilled work at 45 cents an hour.

4. The lock was constructed by the use of a cofferdam built along the west bank

of the river parallel with the stream, according to specifications, using the open-cut method of excavation, which plan was approved by the contracting officer.

5. The foundations and structure of the dam were constructed by means of sinking 21 caissons from the structure of the lock location to the abutment on the opposite side of the river, and that method of construction, and the plans and blueprints showing that method were approved by the contracting officer.

6. In calculating its bid and preparing its plans for carrying on the work plaintiff contemplated working during the winter months as far as practicable, until the weather became too severe, and planned to complete the entire project in 1936. Plaintiff received notice to proceed on September 25, 1935, but had performed considerable work prior to that date. Shortly after the work began in the fall of 1935, an unsatisfactory condition was discovered in the rock foundation for the lock, which condition made necessary considerable extra work, caused material changes in the plans, and resulted in change orders Nos. 2 and 5, which increased the price of the project by approximately $250,000 and extended the contract time by 185 days, or until July 1937. These change orders were accepted by plaintiff in writing. The work proceeded until mid-winter when, by reason of unusually severe weather, plaintiff closed down the project from January 5, 1936, until April 24, 1936. By change order No. 33 plaintiff was granted 111 days' additional contract time on account of unusually severe weather, which change order was accepted in writing by plaintiff.

Plaintiff resumed work in the spring of 1936 and carried it on through that year, expecting to complete the project, including the extra work, early in July 1937. However, plaintiff closed down the project for the winter period on December 5, 1936, and resumed work March 24, 1937. Early in 1937 plaintiff formulated a new progress chart, expecting to complete the project by November 1937, but failed to do so and again closed the project down from November 24, 1937, to April 24, 1938, when it resumed work and completed the project, which was accepted by the defendant on October 7, 1938.

7. The National Reemployment Service (hereinafter referred to as "NRS"), an agency of the U. S. Employment Service, designated its branch offices at Greensburg in Westmoreland County, and Kittanning, in Armstrong County, Pa., as the offices from which plaintiff should requisition labor, but during the course of the contract the office at Kittanning was discontinued and operations were confined to the Greensburg office.

8. The immediate vicinity of plaintiff's project was rural. Kittanning and Greensburg were the principal large towns in the counties mentioned. Kittanning had a population of approximately 7,500 and was about 9 miles from the work, while Greensburg was about 45 miles from the work and had a population of approximately 16,000. There were 3 or 4 small villages within a few miles of the project, each having a population of a few hundred. There were a large number of coal mines in Armstrong County and a high percentage of its working people were coal miners. Prior to and at approximately the time plaintiff's project was commenced there were a large number of persons on relief in the two counties, enough to supply plaintiff's project with the required amount of labor. However, under Federal and other programs, projects were undertaken to relieve this unemployment, and at the time plaintiff's project was in operation much of the relief labor was being absorbed by those projects. Plaintiff's project required normal employment of from 600 to 650 workmen, approximately 75% of whom were equally divided between carpenters and common laborers.

9. Prior to bidding on this contract plaintiff visited the site of the work and the general community, and made an investigation of the available supply of labor to be had from relief rolls in the vicinity of the project and had knowledge of the conditions existing. Plaintiff believed that there would be an ample supply of the type of labor necessary to properly staff the job.

10. The procedure for requisitioning and referral of workmen to plaintiff's project was explained to plaintiff by NRS during the early part of the job. At the beginning of the project, when a requisition came in, the NRS office selected from names of workmen registered in its office all persons in the categories requisitioned who were on relief, considered their qualifications for employment and referred to the contractor those it deemed qualified. Subsequently, the procedure was changed so that when a requisition was received at the employment office, NRS would requisition from the

Works Progress Administration (hereinafter referred to as "WPA"), sufficient relief labor to refer to the contractor, and WPA made labor available for such referral to NRS in the following categories: First, from persons then working on WPA projects; second, from persons awaiting reassignment to WPA projects; and third, from persons awaiting initial assignments to WPA projects. In the event that those three categories did not provide sufficient labor, WPA was then required to give NRS an exemption from the referral of relief labor, and nonrelief labor was referred to the project.

A worker referred would be given a referral or assignment slip which he was to take to the contractor and present himself as an applicant for work. Duplicates of this assignment slip were also mailed to the contractor, who was to advise NRS as to whether the man was hired.

11. Plaintiff claims that it was caused delay and increased costs because of an insufficient supply of qualified labor at the times required.

Frequently the NRS was unable completely to fill plaintiff's requisitions for workmen, and in such instances obtained exemptions from WPA so that nonrelief labor might be referred to plaintiff. In some instances where exemptions were first obtained, the time required in obtaining the exemptions, according to the rules provided for that purpose, was considerable and the plaintiff was short of labor during the delay. Once the exemptions were obtained, they remained in effect throughout the performance of the contract.

An instance of delay in originally obtaining exemptions is that on or about August 13, 1935, plaintiff requisitioned six crane and shovel operators. NRS was unable to furnish them, and plaintiff asked that they be obtained from nonrelief labor. Under the procedure provided for obtaining exemptions at the time, the Pennsylvania State Director notified the contracting officer by telegram. The U. S. Engineer Office then contacted the State Director of NRS in New York as well as similar officials of Ohio and West Virginia, who replied that they likewise were unable to supply the required labor. Then the contracting officer telegraphed the Chief of Engineers requesting exemptions for the desired labor, which were granted. Under the exemptions NRS was authorized to furnish operators from nonrelief sources.

This procedure required until approximately August 28, 1935, during most of which period plaintiff suffered delay.

The same procedure was followed with similar experience when plaintiff was not supplied with an electric whirley operator who had been requisitioned. After 18 day's delay the exemption was granted.

On September 10, 1935, plaintiff advised the defendant that it was having trouble securing crane operators and pile drivers and stated: "I am personally taking the liberty this afternoon to telephone experienced crane operators to report at once for work * * *." In the meantime the usual procedure was in progress for securing exemptions of 18 crane operators, which exemptions were secured from WPA on September 16, 1935, after a delay of six days.

On October 26, 1935, plaintiff wrote to the contracting officer regarding labor difficulties and requested that liquidated damages be waived or that plaintiff be given authority to secure labor from any source. November 18, 1935, the contracting officer advised plaintiff that there was no basis for a time extension due to the labor situation as it had existed to that date, and that he was not authorized to permit the contractor to work labor except through NRS. Plaintiff took no appeal from this ruling.

On November 11, 1935, plaintiff advised defendant of difficulties in securing carpenters and form builders for whom requisitions had been made October 28, 1935, and stated that unless carpenters and form builders were supplied it would be necessary to work the carpenters they had in excess of 130 hours per month. November 15, 1935, plaintiff was advised that steps were being taken to secure exemptions for the necessary labor and that pending action on these exemptions form builders were requested to exert every effort to train such semiskilled labor as might be feasible. In the meantime, after much discussion by telegram and letter regarding exemptions of carpenters and form builders, exemptions for 25 carpenters were granted, December 13, 1935.

On December 11, 1935, due to shortage of labor on relief rolls, the Engineer Office granted plaintiff permission to employ manual labor not more than 8 hours in any one calendar day and not more than 40 hours in any one week. Again, on May 13, 1936, due to inability to supply carpenters and carpenter helpers for the

project, the defendant authorized plaintiff to work them not more than 8 hours in any one calendar day nor more than 56 hours in any one calendar week. Again on June 19, 1936, due to shortage of tractor operators plaintiff was permitted to employ men of that classification not more than 8 hours in any one calendar day nor more than 56 hours in any one calendar week.

On June 19, 1936, plaintiff wrote the defendant's office at Pittsburgh that of 50 carpenters requisitioned on May 8, 1936, only about 25 had reported and that a further requisition was issued June 5th, and that mainly through plaintiff's efforts several carpenters had been obtained; that due to shortage of labor the work had slowed down to about 50%, concrete pours were becoming smaller and carpenter work increasing daily, and that plaintiff would be unable to operate under these conditions.

On April 3, 1937, plaintiff wrote NRS relative to labor conditions, advising of eight instances of issuance of requisitions for workmen where the requisitions were but partially filled, and asking for relief from this situation. April 15, 1937, defendant's Engineer Office advised plaintiff that due to unobtainability of labor in the various classifications desired, in the emergency, authority was given to employ labor not more than 8 hours in one calendar day and 56 hours in one calendar week.

12. The following table shows the number of workmen requisitioned by plaintiff, the number of workmen reporting to plaintiff after being referred by NRS, and the number of days of excused delay granted by defendant because of insufficient labor:

1935, 1936, and 1937 as 103 instead of 131 as shown in the table.

13. WPA, which made relief labor available to NRS for referral, declined in some instances to make available for referral to plaintiff and other projects, workmen who were on relief but who were employed on projects carried on under its own supervision, which concerned the health and public safety of the general community and from which the authorities felt they should not remove their relief labor. There were also instances where the WPA declined to make available to plaintiff's project workmen who lived a considerable distance from the project, by reason of the transportation and boarding difficulties to which workmen would be subjected, if required to work at plaintiff's project.

14. NRS under its rules and regulations referred to plaintiff's project all available labor of various classifications on its lists. It also referred men whom plaintiff had requested to be assigned to the project, even though such men were not on relief, where it had an exemption from WPA for men of the classification requested.

15. A considerable amount of plaintiff's work was unpleasant and relatively undesirable because it was performed in the river and necessitated men wearing heavy boots and working in water. At times during the fall and approaching winter there were occasions when snow, ice, rain and cold prevented plaintiff from carrying forward the work for more than two or three days a week, and the workmen were unable to earn enough in a week to make the job worth while, considering their weekly expenses. By reason of these con-

| Year | Workmen requisitioned | Workmen reporting | Additional days granted | Change order |
|---|---|---|---|---|
| 1935 ..................... | 422 | 137 | 14 | No. 3. |
| 1936 ..................... | 314 | 93 | 30 | No. 9. |
| 1937 ..................... | 510 | 147 | 87 | No. 16. |
| 1938 ..................... | 185 | 61 | 18 | No. 18. |

The determination of the number of days of excused delay granted the plaintiff as shown in the foregoing table, was arrived at by the use of an erroneous formula. A more nearly correct computation gives the number of days' delay, during the years ditions plaintiff's project was unattractive to workmen. Some workmen would not accept employment on the project, and quite a number of men quit their jobs with plaintiff and went to the coal mines and to other projects which afforded better wages

and more satisfactory working conditions. Plaintiff granted releases to many workmen at such times as it could not give the men enough work so that they could earn reasonable wages. Defendant's representative on the job also granted releases to men for physical infirmity or other reasons which appeared to justify such action.

Plaintiff in ordering its labor from the Employment Service specified qualifications for the workmen it desired. On August 24, 1938, it ordered 15 carpenters, the requisition reciting that they "must have thorough knowledge of the trade and have tools; previous experience on dam construction necessary." May 7, 1938, plaintiff requisitioned 3 crane operators, the requisition stating that "they must be thoroughly experienced in operation, care and adjustment on Lorain 75-A crane and shovels." May 8, 1938, plaintiff ordered 1 dipper tender, the requisition stating that "he must have had at least 10 years' experience in operation of dipper or dipper dredge." Also 3 dredge firemen who must be "thoroughly trained and experienced in firing boilers of all types of floating equipment; cleaning flues and installing and repairing tubes; operating spudding engine, niggerheads, etc., and shall operate dredge in emergencies." Also 4 deckhands who shall have "extensive experience on naval equipment, skilled in throwing lines, etc." Also 1 cook who "shall have at least 10 years' experience as cook on floating equipment." June 21, 1938, plaintiff ordered 4 laborers who must be "physically fit, willing to do a fair day's work and have previous experience on dam construction." July 7, 8, and 9, 1938, plaintiff ordered 150 laborers who must be "physically fit and willing to do a fair day's work with pick and shovel. Will be required to work in water and must report for work supplied with hip boots."

16. The effect of the conditions hereinbefore described was that frequently a sufficient supply of labor was not available for reference to plaintiff's project and plaintiff was seriously delayed in carrying on its work efficiently and in accordance with its progress schedule.

17. Plaintiff was granted extensions of contract time on account of insufficient labor during 1935, 1936, and 1937, totaling 131 days, as follows:

Change order No. 3, dated April 27, 1936, granted an extension of 14 days, covering the work period of 1935.

Change order No. 9, dated February 6, 1937, granted an extension of 30 days, covering the year 1936.

Change order No. 16,[1] dated December 31, 1937, granted an extension of 87 days, covering the year 1937.

The change orders contained the following provision: "It is further understood and agreed that all other terms and conditions of said contract as modified by change orders numbered * * * shall be and remain the same."

Each of these change orders was based on a letter of the contracting officer to plaintiff making findings of fact and giving his determination thereon, which contained the following provision: "Should you not agree to this finding of facts, you have the right to appeal under Article 9 of your contract. Your attention is specifically directed to the fact that your appeal must be made within 30 days in order to receive consideration. Appeals should be addressed as follows: To the Chief of Engineers, U. S. Army, * * *."

Plaintiff did not protest or appeal in writing to the head of the department from the contracting officer's letters containing findings of fact, or from the change orders, but accepted the change orders in writing.

Plaintiff was aware when these change orders were executed that its work was being retarded by reason of an insufficient supply of labor.

18. The specifications provide in paragraph 2-01 (2) as follows: "(2) Dam.— The dam shall be constructed in three or more successive cofferdams starting at the abutment side and inclosing such lengths of dam as may be proposed by the contractor and approved by the contracting officer. (See paragraph 1-03A.) The upper arm of the final cofferdam shall be built to an elevation not less than three feet higher than the crest of the dam. For the passage of water during the latter stages of the construction, the first 700 feet of dam shall be constructed with temporary openings aggregating in length not less than 300 feet and extending from elevation 800.0 to the crest. After the closing section of the dam has been completed the

[1] The subject matter of change order No. 16 was subsequently involved in another request by plaintiff which is considered in finding No. 25.

openings shall be closed by watertight bulkheads on the upstream and downstream sides and pumped out and the dam then completed in accordance with the contract plans. The construction of the lock and the abutment of the dam may proceed simultaneously but the work within the cofferdam of the lock shall have been completed, with the exception of Part 'D,' and the lock cofferdam entirely removed before the river is obstructed by any cofferdam used in connection with the construction of the dam. The first cofferdam for the dam shall enclose not more than 320 linear feet of permanent work and the second cofferdam not more than an additional 320 feet of permanent work. The remaining work to be done in the final cofferdam. For the protection of the river wall of the lock during the period when navigation is being passed through the temporary channels, the contractor shall construct and maintain in place at the upper end of the river wall a substantial floating timber crib approximately 4 feet in depth, 4 feet in width, and 100 feet in length and shaped to the bevel of the wall. The cost of this work shall be included in the unit price bid for cofferdam, and no payment for work or materials used for this purpose will be made under the unit prices bid for the permanent work."

Paragraph 3–01 (d) of the specifications reads as follows:

"(d) Caissons.—The foundation structures of the dam and abutment up to elevation 795.0 may be placed by means of caissons. If the contractor proposes to use this method of construction he shall submit to the contracting officer for his approval, detailed drawings of the design of the caissons and a complete description of the methods proposed. No method of construction shall be used that is not approved by the contracting officer.

"Caissons shall be built on steel cutting edges and shall be properly reinforced to withstand all stresses incident to sinking. 5.5 bags of cement shall be used for each cubic yard of concrete from the cutting edge to a level four feet above the roof of the working chamber. Dredging wells shall be circular in section and not more than eight feet in diameter."

The defendant contends that plaintiff suffered material delay during the winter months by its failure to build cofferdams within which to construct the dam across the river.

19. In carrying on its work, plaintiff did not build cofferdams within which to build the dam, but constructed the foundations and structure of the dam by means of sinking 21 caissons from the structure of the lock location to the abutment on the opposite side of the river. (See finding 5.) The caisson method chosen by plaintiff was in accordance with sound engineering principles and was believed by plaintiff to be best adaptable to the conditions under which the work was to be performed. The drawings for the caisson work were approved by the contracting officer who, with knowledge that no cofferdam was built, approved plaintiff's action in thus carrying on the work. The proof does not show that plaintiff's method and action caused more delay than if cofferdams had been constructed.

20. In 1937 plaintiff found it necessary to change its plans for carrying on the work. Plaintiff had originally contemplated diverting the water of the river through the lock, thus permitting work on the dam breast during 1937. The defendant's engineers declined to permit this method of carrying on the work, on the ground that the foundation of the lock might be washed out if both the upper and lower gates were opened, and that too great a strain might be placed upon the gates by the force of the current of the river. Plaintiff was materially delayed by having to make this change in its plans.

The decision of the contracting officer disapproving plaintiff's proposed method was orally communicated to plaintiff who did not request a written decision by that official. Plaintiff did not protest or appeal in writing from the determination of the contracting officer, but accepted his decision as final and proceeded with the work.

It is not shown by the proof that defendant's engineers and the contracting officer acted unreasonably in disapproving plaintiff's proposed method of work.

21. Plaintiff closed down its work during the winter period of 1936–37, and on November 18, 1937, approximately a year later, requested an extension of contract time to cover this period. Plaintiff's letter, in part, stated:

"Our main reason for cessation of operations during the winter of 1936–37 was that of our inability to maintain a sufficient labor force to carry on our work with any degree of satisfactory progress. As will be noted in the succeeding portion of this

letter, operating conditions at this season of the year are such that a worker is not able to draw more than one or two days' time per week. This condition is brought about by the fact that many times a form must remain for a week before the temperature is high enough to allow us to commence a pour. This unworkable time is due further to inclement weather, flood, and ice jams.

"Not only was it impossible to maintain an organization because we were unable to provide enough work for the worker to earn a living wage, but also because one of the main livelihoods in this section is that of coal mining, which industry flourishes and attracts the local labor during the winter season. It is therefore not surprising that a great majority of our workers revert back to this industry, it not only paying more than an average wage, but also giving them assurance of better working conditions and steadier employment during cold weather.

"The situation is further aggravated by the fact that projects were started and carried through the winter, tending to take up the persons not gainfully employed. This work was such that it was not affected by the winter weather, thus giving a steady income to its workers. Said projects were also more desirable in that they were in closer proximity to the individual's home.

"The shortage of labor is by no means a new hindrance in the carrying on of our work. Both Change Order No. 3 and Change Order No. 9 contain extensions of time on this account. Inasmuch as extensions of time have been granted for labor shortage during the summer season, it naturally follows and is not surprising that such a shortage is exceedingly more prevalent during the winter months.

"Not only is our request made on the basis of an inevitable labor shortage, but we feel that we are further substantiated in our claim by reason of weather and river conditions which we recount later in this letter.

\* \* \* \* \*

"In addition, we wish to bring to your attention the following fact: At the time this contract was signed, we were permitted 450 days to complete the project. From Page E of the Specifications, Par. VIII(c), it is evident that the 450 days so allowed were to include all necessary delays due to high water and inclement weather. To date sixteen change orders have been executed.

Every one, of course, has carried with it an agreed amount of time to complete the specific work therein stipulated. However, no time has been allowed by your office for inclement weather, high water, etc., which might be encountered during the prosecution of this extra work.

"Incidentally, it may be truthfully said that the incorporation of this work within our original contract is the primary reason why this project at the beginning of the 1937–38 winter season, has not already been completed. We also wish to add that the alteration of our contract quantities has not only given us ground for additional time extension, but also it has created an additional fixed expense which could not have been foreseen at the time our bid was submitted.

"In view of the facts as outlined above and the information at hand, we feel that our request for an extension of time as stated is certainly in order and that such extension is reasonably forthcoming."

February 5, 1938, the District Engineer wrote a fact-finding report which concluded that:

"a. The contractor has presented no facts to show, nor do the records indicate that he would have experienced any material labor shortage during the 1936–37 winter season, had he chosen to continue operations.

"b. The shutdown was a result of the contractor's own volition; was not required or approved by this office, and was not necessitated by any unforeseeable conditions.

"c. The contractor failed to protest my decision on this matter until approximately one year after it was given.

"d. Had work been in progress, it would probably have been delayed 21 days by flood conditions.

"e. There were 5 periods of 'severe' weather, totaling 30 days, during the winter of 1936–37. However, no extremely low temperatures were recorded and the winter was, generally speaking, mild for the section of the country involved."

On February 23, 1938, in connection with its request for an extension of time for the winter period of 1936–37, plaintiff again wrote the District Engineer as follows:

"Furthermore, in reference to Par. 8(c) (2) of your report—'without the addition of any extra work to the contract, the work would not have been completed by the winter of 1936–37. The contractor's con-

tention that it could have been completed prior to the 1937–38 winter season is, in my opinion, irrelevant in considering the instant claim,' we wish to clarify the relevancy of our contention to this claim. Had not the extra work been incorporated in our contract, we would have completed our job in the fall of 1937, ahead of schedule, therefore having no need for an extension of time as a result of conditions existing during the winter of 1936–37. However, with the addition of this extra work, we were left at the beginning of this winter season with 15% of the contract to complete, necessitating the asking of additional time as a result of aforementioned causes.

\* \* \* \* \*

"Furthermore, inasmuch as the Employment Office was unable to furnish enough men during the summer months when conditions were at their best, we feel that we were justified in pushing our operations during that season rather than experience a complete shut-down as a result of labor shortage during the winter. In addition, we wish to state that the reduction of men was not through any action of ours. The reduction was caused rather by the individuals themselves who, not being able to obtain sufficient work on this project as compared with that available elsewhere in the vicinity, asked us to release them. This condition of lack of sufficient work for the men was brought about by the fact that during November we were not permitted to pour concrete unless the ambient atmospheric temperature was at least 20° F. and rising. Therefore, not being able to obtain men from the National Reemployment Office on one hand, and our men leaving the job on the other, we were approaching the time, when further operations would have been impossible."

22. Defendant's District Engineer wrote plaintiff December 1, 1937, as follows:

"I have to inform you that your progress in the construction of Lock and Dam No. 9, Allegheny River is unsatisfactory.

"The work is some months behind schedule and it is apparent that it will not be completed within the time set therefor by the contract as modified by Change Orders 1 to 15, inclusive. The time now set for completion of the contract is December 7, 1937, with probable extension of a few days under Change Order No. 5, depending upon the quantity of additional rock excavation that may be required under that change order.

"Report has been received that you are preparing to suspend operations during the winter. It is urged that you continue the work to completion without unnecessary delay.

"Your attention is invited to Article 9 of the contract and Paragraph 1–03 of the specifications which require payment by you to the Government as liquidated damages the sum of $300.00 for each calendar day of delay after the date set for completion of the contract until the work is completed and accepted, excepting for delays due to unforeseeable causes beyond the control and without the fault or negligence of the contractor. In this connection it is to be noted that ordinary winter weather is not an excusable cause of delay under the contract."

23. Plaintiff also closed down its work for the winter period of 1937–38 and on March 3, 1938, requested an extension of contract time to cover this period. Plaintiff set forth the condition of the weather during the period and stated:

"Furthermore, 15% of the present contract which remains to be completed is approximately equal in amount to the additional work added to the original contract. We feel that had not this additional work been incorporated in our contract we would have completed this project during 1937. On the other hand, the time remaining on the contract on November 25, 1937, when we were forced to shut down, was sufficient to enable us to complete the now remaining work had it occurred at the outset of a season of the year when practical operations are possible and warranted.

"We hereby request, therefore, an extension of time for the portion of this season beginning on November 25, 1937, and extending to the 1st of March 1938, such request being further subject to change depending on future conditions."

When the work was closed down for the winter period 1937–38 there remained approximately $312,045 of work yet to be performed under the contract.

Defendant under date of April 7, 1938, made findings of fact regarding plaintiff's request and concluded:

"a. The contractor shut down operations during the winter of 1937–38 voluntarily and on his own initiative; the shut-down was not approved by this office; and it was not necessitated by any unforeseeable conditions.

"b. The contractor failed to notify me in writing of the causes of delay within 10 days from the beginning thereof.

"c. The winter of 1937–38 was an average one for the locality involved."

24. May 16, 1938, the District Engineer advised plaintiff in writing:

"By letter of May 10, 1938, I advised you that, since an appeal to the Chief of Engineers had not been taken by you on your claim No. 2 within 30 days, as allowed by article 9 of the contract, my decision as contained in my findings of April 7, 1938, would be final and conclusive on the parties to the contract. This ruling applies also to your claim No. 1, my decision on which was contained in my findings of February 5, 1938.

"If you feel that the above does not constitute a just disposition of the matter and wish to submit an appeal, the appeal will be forwarded to the Chief of Engineers for such action as he deems proper. Unless an appeal is submitted, no independent decision on the above claims will be rendered by the Chief of Engineers. Appeals should be addressed as follows: * * *."

On May 13, 1938, plaintiff appealed to the Chief of Engineers as to both the winter periods.

25. On April 27, 1938, plaintiff wrote to the contracting officer, in connection with Change Order No. 16, dated December 31, 1937 (see finding No. 17), as follows:

"Your office, on December 31, 1937, issued to us Change Order No. 16 granting us 87 days' extension of time on account of delays in completing our work due to the insufficient supply of qualified labor from the offices designated by the United States Employment Service on our contract No. ER–W1101eng.–3, dated August 5, 1935, for constructing Lock and Dam No. 9, Allegheny River and Alterations to Dam No. 8, Allegheny River.

"Had this labor been furnished to us by the designated labor agency (or our request granted to hire labor from other sources) during the period from July to October 1937, the work on our contract would have been entirely completed, with the possible exception of the ten openings left in the dam for by-passing the water. Even with this amount of work to be completed on November 25, 1937, our company would have made every human effort to complete the work rather than carry it over until the spring of this year. Closing of openings does not necessitate the ideal conditions required to seal off the caissons, due to the fact that floating equipment used in this stage of the construction is less affected by fluctuations in the level of the river. However, if the work on the ten openings could not have been completed during the winter of 1937–38, certainly this portion of remaining operations could have been started by April 1st of this year.

"Solely due to a great deficiency in the supply of laborers and mechanics as previously stated, our operations were impeded and delayed to the extent that we did not get six caissons completed and sunk before we were driven out of the river on account of high water—leaving the most important work of sinking and sealing of these six caissons, which are in the main flow of the river and which require considerably lower water to commence work than we have had up to this writing. Furthermore, it would not have been necessary for our company to carry our organization throughout the winter of 1937–38 if all work had been completed except the ten openings.

"Therefore, in view of the fact that the 87 days' delay was incurred during the most favorable working season of the year, we feel that it is only fair that this extension of time be applied at a period when the conditions are comparable to those in which the delay took place: namely, the coming months of 1938."

On May 19, 1938, the defendant in replying to plaintiff's letter of April 27, 1938, stated in part as follows:

"5. I have investigated the conditions as set forth in your letter, and my findings of facts are as follows:

"a. That Change Order No. 16, dated December 31, 1937, granted you an 87-day extension in time for the period from March 17, 1937 to October 23, 1937, because of delays occasioned by the inability of the office designated by the United States Employment Service to furnish a sufficient supply of qualified labor.

"b. That a careful review of the progress records reveals that, had it not been for the above-mentioned 87 days of delay, you could probably have completed your entire contract, with the possible exception of concreting the bypass openings, by the end of November 1937.

"c. That the closing down of operations on November 25, 1937, was not due to any

action or requirement of the Government. Had you constructed a cofferdam, as contemplated by paragraph 2–01(a) (2) of the specifications, and continued work after November 25, 1937, you would, in my opinion, have had no material difficulty in completing the work within the contract time, i. e. by March 19, 1938.

"d. That your contract allowed 450 calendar days for the completion of the work, and all extensions thereto have been made on the basis of calendar days. It is obviously impossible to arrange the time so that extensions can always be applied at periods when conditions are comparable to the periods in which the delays take place. Prior to the issuance of Change Order No. 16, the date set for the completion of the contract was December 22, 1937. Change Order No. 16, allowing for delays occurring during the spring, summer, and fall of 1937, extended the completion date of the contract to March 19, 1938. Obviously, the time extension in this case was applied during a season somewhat less favorable for operations than the season during which the delays occurred. However, if reference is made to Change Order No. 3, which also granted an extension in contract time, under Article 9 of the contract, it will be noted that, while most of this delay occurred during one of the most severe winters on record, the 125-day extension of time therefor, was applied to the period March 23, 1937 to July 26, 1937, or during a very favorable working season. Extensions of time under Article 9 of your contract seem to indicate an equitable distribution between favorable and less favorable construction seasons.

"e. That the present date set for the completion of your contract is March 19, 1938, anticipating 15 days' additional time yet to be granted for work under Change Order No. 5. This date has been determined by giving due extensions of time for all changes, extra work and delays occasioned under the contract to date. I have no authority to extend further your contract time.

"6. Should you not agree with these findings of fact you have the right to appeal under Article 9 of your contract. Your attention is specifically invited to the fact that your appeal must be made within 30 days in order to receive consideration. Appeals should be addressed as follows: * * *."

Correspondence was carried on between the parties, during which plaintiff's claim was denied and reconsidered.

26. After all of the work on the contract had been substantially completed, plaintiff on September 27, 1938, claimed that it was delayed 49.47 days due to insufficient supply of qualified labor in 1938. On October 3, 1938, the contracting officer made findings that plaintiff had been delayed 18 days from said cause, and advised plaintiff that if it did not agrée with the finding, appeal should be made to the Chief of Engineers, and at the same time plaintiff was presented with a change order (No. 18) extending the time for 18 days. Plaintiff signed this change order in the following language: "The foregoing modification of said contract is hereby accepted, subject, however, to the specific proviso that such acceptance shall not limit or restrict to any extent or in any manner the right of the contractor to make or prosecute any claim or claims whatsoever under the aforesaid contract, nor does the contractor surrender any of its rights under said contract."

27. On October 3, 1938, the defendant issued Change Order No. 19, concerning the rental of a derrick boat. This change order was accepted by plaintiff in the same language as the proviso set forth above, relating to Change Order No. 18.

28. On November 15 and 16, 1938, a conference was held in the office of Colonel Covell who was District Engineer and Construction Officer, plaintiff's counsel, Mr. Robert P. Smith, the plaintiff, and some of the defendant's engineers in order that plaintiff might secure moneys which were still due it under the contract, and at the same time sign Change Orders Nos. 18 and 19 under protest. At that time plaintiff's counsel exhibited a letter from plaintiff to the District Engineer reading as follows, except for the concurrence by the District Engineer at the bottom thereof:

"November 16, 1938.

"Lt. Col. W. E. R. Covell,
"United States Engineers Office,
"Federal Building, Pittsburgh, Penna.
"REF: No. ER–W1101eng.–3
"Dated August 5, 1935.

"Sir: There are enclosed herewith Change Orders Nos. 18 and 19 properly signed by us.

"It is our understanding that in signing all of Change Orders Nos. 1 to 19 inclu-

sive the contractor has not surrendered any rights under the contract and the acceptance of the change orders covers only the subject matter contained therein and does not limit or restrict to any extent the right of the contractor to make or prosecute any claim whatsoever under the aforesaid contract.

"We understand that this is in accordance with your viewpoint as stated at our conference in your office on November 15, 1938, and we would appreciate your confirmation of this.

> "Respectfully,
> > "York Engineering & Construction Co.,
> "By [s.]   S. W. Harbold.
> "Concurred in:
> > "[s.]   W. E. R. Covell,
> > "Lt. Col., Corps of Engineers,
> > "District Engineer."

The District Engineer requested his resident engineer, Mr. Winn, in the presence of plaintiff's representatives and their attorney to determine whether or not in signing the letter he would in any way reopen any change orders or claims that had been previously decided, and whether or not he would be stepping outside of the contract provisions. Upon being advised in plaintiff's presence that the signing of the letter would not reopen any change orders or any matters upon the contract that had been decided previously, the District Engineer signed his concurrence in said letter.

29. On November 16, 1938, plaintiff filed its itemized claim alleging breach of contract covering items of unnecessary expenditures, overhead, together with claim for remission of liquidated damages in the sum of $400,000. The qualified acceptance of change order No. 18 (finding 26) and the filing of claim November 16, 1938, advised defendant for the first time that plaintiff would claim damages or excess costs.

The Chief of Engineers considered plaintiff's claim, forwarded the same to the General Accounting Office under date of July 29, 1939, recommended denial of various items except liquidated damages, and in connection with the item of liquidated damages stated:

"5. Liquidated damages—The contractor's claim for remission of liquidated damages is based upon two contentions. (1) that it was delayed due to unusually severe weather conditions; and (2) that it was delayed in the prosecution of its work due to inability to secure qualified labor from the relief rolls.

"With reference to (1), the contractor has not presented any evidence showing wherein the ruling of the Acting Chief of Engineers dated August 2, 1938, copy inclosed, is in error.

"With reference to (2), certain additional information has been presented relative to said delay which has hitherto not been considered by me. The District Engineer reports that, during the periods December 8, 1936, to March 31, 1937, and November 25, 1937, to June 1, 1938, a total of 202 days, or 290 calendar days beyond the original completion date, the contractor had closed its operations. The District Engineer further advises that, in his opinion, the reason for not completing the contract work within the prescribed time was due (a) to its failure to build an adequate cofferdam as provided for in the contract, and (b) to its resultant inability to work during winter weather.

"The contract provided for the erection of a cofferdam, or other approved means to facilitate the elimination of the river water, and enable the construction of the dam. The contractor elected, with the approval of the contracting officer, to use caissons for this purpose. Under the local conditions, the cofferdam method would have been more adaptable to winter operations. However, it is my opinion that the contractor had a right to use any elected method of construction, provided it was in accord with good engineering principles, and would insure timely completion of the work. There is no evidence of record to indicate that the caisson method of construction would be unsatisfactory in these respects. It is the contractor's contention that the time allowance for any excusable cause of delay should take into consideration the elected method of accomplishing the work, in the instant case, allow for the winter shutdown periods.

"I am in accord with the contractor's views in this respect, and consider that an equitable adjustment of time due to delays from authorized causes, or needed to effect necessary changes, would be an extension equal to the amount of time by which the completion date of the contract is delayed by such causes rather than an extension equal to the exact period of delay. In this connection the record discloses that the

contractor's work was extended, for allowable causes and for changes authorized under Article 3 of the contract, beyond the original contract completion time through two winters. During these two winters the contractor suspended work after the original completion date for a total of 290 calendar days. As the extension of time granted under the various change orders did not take this factor into consideration, it is my opinion that the contractor is entitled to an additional allowance of time equivalent thereto. The total period for which liquidated damages were assessed is 189 days, which would entitle the contractor to a remission of all of them.

"In the consideration of this claim, attention is invited to the fact that all of the change orders, with the exception of the last two, were accepted without protest by the contractor. However, the nature of the conditions incident to the work were such that the contractor could not foresee the loss of time due to the winter shutdown periods when the respective change orders were issued, and thus be in a position to register a protest. The following factors contributed to these conditions: (1) in some of the extra-work change orders the actual time allowance was indeterminate when issued, as said time was dependent upon the amount of material removed; (2) it was not possible to attribute the advancement of the work into the winter season to any particular change order—it was the effect of all of them; and (3) it was not known in advance for how long, if at all, it would be necessary to suspend work due to unfavorable winter conditions. For the foregoing reasons, I consider the contractor's protests on the last two change orders to be within the time limit provided in Articles 9 and 15 of the contract. In view of the above enumerated conditions, the action taken by the Acting Chief of Engineers in his letter of March 27, 1939, copy herewith, upon the contractor's appeal of June 17, 1938, was not based upon a complete knowledge of all of the circumstances and, for that reason, should not be considered in conflict with the recommendation herewith.

"In accordance with the above, it is my recommendation that all liquidated damages assessed against the contractor be remitted."

30. Plaintiff suffered delays in carrying on its work under the instant contract in 1935, 1936, 1937, and 1938 by reason of NRS failing to supply to the project a sufficient number of workmen. To December 31, 1937, under the method of calculation used by both plaintiff and defendant in making calculations in regard to the assessment of liquidated damages, this delay amounted to 131 days for which the defendant granted change orders Nos. 3, 9, and 16. As stated in finding 12, this method of calculation was erroneous, and attributed more days' delay to shortages of labor than a correct method would have done. Plaintiff accepted these change orders and did not protest or appeal from them in writing, as required by Article 9 of the contract. (See finding 17.)

Plaintiff suffered material delays which were not attributable to lack of available labor. The number of days of these delays is not determinable from the evidence. Plaintiff's failure to complete the project by November, 1937, was the result of the combined operations of the delays due to shortages of labor and to other causes.

The evidence does not show that plaintiff would have completed its work on the entire project by November 2, 1937, even if it had had an adequate supply of labor. With such a supply, plaintiff probably would have completed the work about June 15, 1938.

31. Of plaintiff's sixteen causes of action set forth in the petition, all except those designated "Second," "Third," "Twelfth," and "Fourteenth" seek to recover damages arising out of a claimed breach of contract on the part of defendant in failing to supply sufficient qualified labor in accordance with the terms of the contract. They will now be taken up and considered.

### First Cause of Action

32. The specifications provided in part as follows: "1–14. Damage.—Damage to Government property, due to failure of the contractor to take reasonable precaution to prevent same, and all loss or deterioration of or damage to the permanent work by flood, accident, or exposure, other than as specified in paragraph 1–06 hereof, prior to final acceptance shall be made good by the contractor without expense to the United States. The contractor will also be held responsible for any damage done to adjoining property through his neglect or failure to properly protect the work and river banks."

Plaintiff and defendant agreed that in lieu of keys, copper strips would be placed

in construction joints. Plaintiff placed the copper strips, and also protective timbers.

During the spring of 1938 these copper strips and protective timbers were damaged by flood. Plaintiff was required to replace these strips at a cost of $306.63. Plaintiff claims that had there been a sufficient supply of qualified labor all of the work would have been completed before the damage was done and it would not, therefore, have had to replace the copper strips. From the denial of the contracting officer of this claim, plaintiff took an appeal to the Chief of Engineers, who also denied it.

### Second Cause of Action

33. The specifications provided as follows: "5–14(e). Construction joints.—Vertical joints shall be formed with tongue-and-groove bonds or keys at such locations and of such shapes and dimensions as approved or directed by the contracting officer. Horizontal joints shall be formed with keys, or, where horizontal pressure is always in one direction, with steps. Where required, dowel rods shall be used. All concrete in vertical members shall have been in place not less than 12 hours, and longer if so directed by the contracting officer, before concrete in horizontal members resting thereon is placed. Before placing is resumed all excessive water and laitance shall be removed and the concrete shall be cut away, where necessary, to insure a strong dense concrete at the joint. Where necessary to secure adequate bond, the surface of existing concrete shall be cleaned and roughened and shall then be spread with a ½-inch layer of mortar of the same cement-sand ratio as is used in the concrete, immediately before the new concrete is deposited. Where specified or otherwise required by the contracting officer for water-tight construction, copper strips of the width shown on the drawings and weighing not less than 20 ounces per square foot, properly crimped or bent, shall be placed in the concrete to span the joint."

Plaintiff was required to place a layer of cement and sand mortar not exceeding ½ inch in thickness on all horizontal construction joint surfaces before placing new concrete thereon in accordance with the above paragraph of the specifications. On June 19, 1936, plaintiff protested the requirement relying on its interpretation of the specifications which required the use of mortar only "where necessary." Reply to plaintiff's protest was made by letter of June 23, 1936, in which it was stated that mortar would be required on all horizontal construction joints since this was necessary to secure adequate bond. Plaintiff did not protest this decision until October 4, 1938. Plaintiff's protest was denied by the contracting officer by letter of October 12, 1938. Plaintiff appealed this decision to the Chief of Engineers on December 7, 1938. The Chief of Engineers after stating that plaintiff had not made timely protest found that the work was within the scope of the contract and that additional payment therefor was not due. It is not shown that the requirement of the district engineer was unreasonable under the conditions existing on this project.

Plaintiff's net increase in cost due to the use of mortar on horizontal construction joints was $2,100.

### Third Cause of Action

34. Plaintiff is claiming compensation of $2,159.09 for being required to place material of cork and tar paper in certain construction joints not indicated in the plans or specifications. Except for a few controlling points the location of monolith joints in the lock and abutment were not indicated on the contract plans. Paragraph 5–14 (d) (4) of the specifications provided that the lay-out of all monoliths would be as directed or approved by the contracting officer before concreting commenced. By paragraph 5–21 the specifications provided that expansion joints would be constructed at such joints as indicated or required. Actually only one expansion joint was indicated on the lock and abutment, it being located at station 11–95 of the abutment. This involved about 100 square feet of expansion joint material. The defendant contends that its engineers required that expansion joints be installed at other locations and of certain dimensions in accordance with provisions of paragraph 5–21 of the specifications.

On October 11, 1935, plaintiff wrote to the District Engineer, saying that it would require several thousand lineal feet of ⅜-inch premolded cork in construction of lock No. 9, Allegheny River, and planned to buy it from the Armstrong Cork Company, Pittsburgh, Pa., and asked if inspection of the material was necessary before it would be approved and could be shipped.

Under the direction of the defendant's engineer on the project plaintiff continued placing these expansion joints until the work involving expansion joints was completed in 1937. Plaintiff made no protest

against so doing until October 4, 1938. On October 28, 1938, the contracting officer made findings of fact stating that the use of expansion material in the monolith joints of navigation lock and navigation dam and abutment is standard construction practice, and that prospective bidders could readily have determined the extent to which the requirements of the specifications would be made to apply. Plaintiff appealed from the decision of the contracting officer to the Chief of Engineers, who affirmed the contracting officer's decision. The placing of the expansion joint material as required by the Government's agents was reasonably necessary.

### Fourth Cause of Action

35. Plaintiff spent $3,660.86 more than it would have spent for electrical power if the contract had been completed November 2, 1937. There is no evidence as to the proportional amount that would have been spent from June 15, 1938, to October 6, 1938, or any other portion of that year.

### Fifth Cause of Action

36. Plaintiff expended for workmen's compensation insurance in 1938 increased costs of $5,221.47 over what it would have paid on the same payroll in 1937. The proof is insufficient to show what the amount of the increase was on the wages paid from June 15 to October 6, 1938.

### Sixth Cause of Action

37. Plaintiff paid $882.06 in unemployment and social security taxes in 1938 which it would not have had to pay for performing the same work in 1937. The proof does not show what the amount of the increase was on the wages paid for the period June 15 to October 6, 1938. The amount claimed in this cause of action is also included in the twelfth cause of action.

### Seventh Cause of Action

38. Plaintiff paid to the Maryland Casualty Company additional premium on its completion bond amounting to $1,761.23, based on the value of uncompleted work as of November 2, 1937, approximately 15% of the entire contract amount. Plaintiff would not have been required to pay that amount if it had completed the work by November 2, 1937.

### Eighth Cause of Action

39. Plaintiff spent $31,483.93 to repair damage caused by cold weather, floods and ice during the winter of 1937–1938.

### Ninth Cause of Action

40. Plaintiff claims that it is entitled to recover the reasonable value of the services of its two copartners from November 2, 1937 to October 1, 1938. Their services were reasonably worth $1,000 per month, each.

### Tenth Cause of Action

41. Plaintiff spent in the operation of its plant subsequent to November 2, 1937, on the contract here involved, the sum of $36,572.38, including the cost of machine operators. The evidence does not show what amount was spent after June 15, 1938. There is no proof that plaintiff had other contracts upon which its equipment could have been placed during 1938. This item is also included in the Fifteenth cause of action.

### Eleventh Cause of Action

42. Plaintiff spent $55,221.76 for material, maintenance, and overhead charges after November 2, 1937, which amount was exclusive of salaries for partners and exclusive of charges that would have been necessary had the work been completed prior to November 2, 1937. The amount so expended for the period of June 15 to October 6, 1938, is not proved.

### Twelfth Cause of Action

43. Plaintiff paid Federal and State of Pennsylvania social security taxes and unemployment insurance amounting to $13,144.16 as a result of legislation enacted subsequent to the date of the contract. Plaintiff on January 7, 1937, requested payment for the amount due up to that date, which was refused by the defendant. The amount of $882.06 described in the sixth cause of action is included in this cause of action.

Plaintiff appealed to the Chief of Engineers from the action of the contracting officer in disallowing the social security tax claim, and the Chief of Engineers sustained the disallowance.

### Thirteenth Cause of Action

44. During the year 1938 plaintiff spent $18,668.86 in obtaining gravel for concrete. Prior to the year 1938 plaintiff had rented equipment from the Allegheny River Sand Corporation for the production of its required gravel. The gravel was used as produced with no additional amount stored up for anticipated future use, because plaintiff had no space to store gravel. There was no insufficiency of labor in the production of gravel. In 1938 the equip-

ment plaintiff had rented for the purpose was no longer available and plaintiff purchased gravel for use during 1938 from J. K. Davis & Brothers of Pittsburgh. It is not proved that plaintiff could have produced the quantity of gravel needed for the entire operation at no additional cost over the costs prior to November 1938. Nor is there proof that the defendant was at fault in failure to provide storage place for anticipated aggregate.

### Fourteenth Cause of Action

45. Between September 19, 1937, and November 27, 1938, plaintiff paid wages to common labor on its project in the total sum of $4,264.58 in excess of the minimum wage scale provided in the contract, being an increase in wages from 45¢ to 60¢ per hour. Plaintiff's reason was that the WPA projects at Kittanning and in the vicinity of Lock and Dam No. 9, had increased the wages of its common laborers from 35¢ to 50¢ per hour, and that in a conference with representatives of defendant plaintiff had been given assurance that an increase in its wage scale, to be paid for by the Government, would be recommended. Plaintiff's laborers were leaving the project and plaintiff experienced difficulty in holding men to carry on the work.

October 28, 1937, plaintiff wrote the contracting officer asking for reimbursement for its increase in wages and was advised that a telegraphic request for permission to issue a change order providing for an upward revision in wage scale to conform to rates established for other governmental construction projects in the vicinity of Lock and Dam No. 9 had been denied by the Chief of Engineers. The District Engineer therefore denied plaintiff's request. Plaintiff, under date of November 10, 1937, wrote the District Engineer protesting the decision, and advising that it would file a claim for the additional wages paid. Plaintiff appealed from this decision to the Chief of Engineers, who denied the claim as being unallowable under Article 18 of the Contract.

### Fifteenth Cause of Action

46. Plaintiff claims that the rental value of its equipment for the period of 149 days during which, according to change orders 3, 5, 9, 16, and 18, the plaintiff was delayed by the lack of qualified labor is $168,036.24. The fair rental value for idle plant owned by plaintiff, for 149 days, is $25,826.66, or $173.33 per day.

### Sixteenth Cause of Action

47. Plaintiff alleges that because of breaches of the contract by defendant the reasonable cost of construction plus a reasonable profit was $2,542,439.45, and that plaintiff had been paid $2,080,305.19, and that the balance of $462,134.26 should be paid plaintiff as an alternative claim. On defendant's objection plaintiff was not permitted to offer evidence in support of this claim.

Robert P. Smith, of Washington, D. C. (William Ristig, of Washington, D. C., on the brief), for plaintiff.

W. A. Stern, II, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff, a partnership, entered into a contract in August of 1935 to build for the United States Lock and Dam No. 9 in the Allegheny River in Pennsylvania. The work was done in the autumn of 1935, and in the open seasons of 1936, 1937, and 1938. It was completed on or about October 6, 1938. The plaintiff was paid the agreed price for the work. It sues here for damages for several alleged breaches of contract by the United States. It sets forth in its petition sixteen separate causes of action. All but 4 of them are for damages which, the plaintiff asserts, resulted from one breach of the contract, viz., the Government's failure to furnish the plaintiff a supply of labor to adequately man the work and carry it forward to completion. The plaintiff asserts that this failure prevented the plaintiff from completing the work before the winter of 1937–1938, which it would have done if it had had an adequate supply of labor, and that several of the items of its claim resulted from its having to carry the work over that winter and through the following summer.

The alleged duty on the part of the Government to supply the plaintiff with labor is said to flow from the following provision of the contract: "Art. 19. (a) Labor preferences.—With respect to all persons employed on projects, except as otherwise provided in Regulation No. 2, (a) such persons shall be referred for assignment to such work by the United States Employment Service, and (b) preference in

employment shall be given to persons from the public relief rolls, and, except with the specific authorization of the Works Progress Administration, at least ninety per centum (90%) of the persons employed on any project shall have been taken from the public relief rolls: Provided, however, That, expressly subject to the requirement of subdivision (b), the supervisory, administrative, and highly skilled workers on the project, as defined in the specifications, need not be so referred by the United States Employment Service. * * *"

The plaintiff's interpretation of this provision of the contract is given in its reply brief as follows: "We submit that under Article 19 of the contract the defendant undertook the responsibility of supplying plaintiff with sufficient workers to properly staff the job."

We think that this interpretation is not the correct one. The primary purpose of most of the public works financed by the Government during this period was to relieve unemployment. In order that the jobs created with public money for this purpose should go to those who were in such distress as to be eligible for the relief rolls, it was necessary that the Government keep a careful check on the roll of employees. Its method of doing so was to require that all employees except those in supervisory, administrative and highly skilled jobs, be referred to the employer by the United States Employment Service. In that way the requirement that 90% of the persons employed should be obtained from the public relief rolls, unless the Works Progress Administration should otherwise authorize, could be enforced.

We think, therefore, that Article 19 was a promise by the plaintiff not to employ labor except as therein provided. We think it also, by implication, contained a promise by the Government to apply the provisions of the article with fair consideration for the problems and difficulties of the contractor, and to make it possible for him to get his work done, if there was not enough relief labor available, but there were persons not on relief who desired to work for the plaintiff. For example, we think that the Government would have breached this implied term of the contract if its Works Progress Administration had not, when there were not enough men on the relief rolls to fill the plaintiff's needs, authorized the United States Employment Service to refer men to the plaintiff who were not on the relief rolls. But there was no such failure, as such authorizations were given with reasonable promptness when the need for them arose, many of them in the first months of the work, and remained in effect for the duration of the work.

The relevant facts concerning the plaintiff's shortage of labor seem to be about as follows. In the summer of 1935, when the plaintiff was about to bid on the work, it inquired in the locality and found that there was a large labor surplus, with many workmen on relief. It therefore assumed and counted on an adequate supply of labor, since it needed only some 600 men. When it began its work, however, it found almost immediately that some classes of labor, such as crane operators, pile drivers and, a few weeks later, form carpenters, could not be obtained from the relief rolls. It requested permission to hire nonrelief workmen for these trades, and the Works Progress Administration authorized the Employment Service to send nonrelief men. The Government also authorized the plaintiff to work the men that it could get a much longer work week than was permitted by the contract without special authorization. Nevertheless, almost from the beginning, the plaintiff did not get enough workmen. Working conditions were not attractive, the work having to be done in water. The principal employment in the area before the depression had been coal mining, and that industry revived, giving employment to many men at higher wages and with more agreeable working conditions than the plaintiff's job offered. The site of the dam was in a rural area, so that there was no great number of workmen living within easy distance. Public transportation was not available, from most directions. The cost of meals and lodging was high, in comparison with the potential earnings, at least of common laborers. The plaintiff did not establish a work camp at the job, so that workmen would have had to find lodging places for themselves, many of them at inconvenient distances from the job. The Government was carrying on, in the area, projects such as the construction of sewers which were of public importance, and which probably competed with the plaintiff's project in the sense that if they had been closed down, some of the workmen on them might have been diverted to the plaintiff's job. The plaintiff's requisitions for men, sent to the employment service, prescribed qualifica-

tions in the way of experience and equipment not likely to be met by many persons living in the area of the work.

The Government was responsible for practically none of the factors listed above, which prevented the plaintiff from getting enough men. It may be that it could have, by the closing down of relief work projects in adjacent areas compelled men to take jobs with the plaintiff and board away from home, though the net wages available to support their families would have been small. We think it has not been proved that the refusal of the relief authorities to thus forcibly recruit workmen for the plaintiff was so inconsiderate of the plaintiff's difficulties as to be a breach of the Government's implied contract.

The plaintiff contends that the Government should have cancelled the requirement of Article 19(a) that the plaintiff should employ only those referred to it by the United States Employment Service. We have indicated above the reason for this requirement. After the Employment Service had been authorized to refer men not on relief, it did so, and permitted the plaintiff to select persons whom it wanted, and send them to register at the Employment Service so that they might be referred to the plaintiff for employment. In that way the plaintiff could get men if it could find them, but the Employment Service would have a record of who they were, where they came from, etc., which might be useful if the relief problem again became acute. The plaintiff contends that if it could have hired men "off the street" at the site, instead of having to send them to register at the Employment Service, it could have obtained enough help. We think this has not been proved. We do not see why a workman, desirous of working for the plaintiff, would be substantially deterred from doing so by being required to register at the Employment Office. It could have been, if it was not, explained to him that he was not asking for relief; that there was no difference between the public employment office and a private employment agency except that the former charged no commission. We think it would have made no substantial difference in the plaintiff's labor situation if the Government had cancelled Article 19 of the contract. The plaintiff had a shortage of labor because there were not enough men, at the place and time, who wanted to work for the plaintiff. So it cannot recover, unless the Government guaranteed to put enough men into the plaintiff's employ and keep them there, to man the job adequately, or pay the plaintiff damages if there should be a shortage, however unavoidable. As we have said, we do not so interpret Article 19(a). We do not read into that language the implication that the Government will pay damages as for breach of contract if an unavoidable shortage of labor occurs, to the contractor's detriment.

The plaintiff urges that it is entitled to recover under the doctrine laid down by this court in the case of Young-Fehlhaber Pile Company v. United States, 90 Ct.Cl. 4. We think not. In that case the Government, though it could not supply the contractor with labor, "in effect declined to consider" his proposition that he be allowed to use his own men, but "told him to go along with what he had." 90 Ct.Cl. 7. As we have said above, we think such conduct on the part of the Government was a breach of its implied contract that the plaintiff should be permitted to get on with his work with reasonable economy if the contemplated source of labor, i. e., relief roll labor, should prove inadequate.

But there was no such breach of the implied contract in the instant case. Exemptions were granted early in the course of performance of the contract, and remained in effect for the duration of the contract, which made it possible for the plaintiff to hire any available workmen merely by having them register at the United States Employment Service. As we have said, it has not been proved that this requirement had any material bearing upon the plaintiff's labor shortage.

We have stated above that the qualifications written into the plaintiff's requests for labor were so strict that they may have contributed to the plaintiff's shortage. It is difficult to reconcile the language of these requisitions with the plaintiff's claim of an acute and damaging shortage of labor. In August, 1938, in the fourth season of the shortage, the plaintiff stipulated, for the 15 carpenters requested, "previous experience on dam construction necessary." How, out of this area, it expected to get carpenters with such experience, is hard to understand. In July, 1938, it requested 150 laborers and said, "Must report for work supplied with hip boots." One of the plaintiff's executives testified that in fact the plaintiff bought the hip boots wholesale at a low price and his testimony may mean that they were supplied to the

workmen without charge. This being so, the plaintiff was negligent to its own damage, since it may have, by this and other requisitions such as are quoted in finding 15, which stipulated qualifications which it did not in fact intend to insist upon, aggravated its shortage of labor. To whatever extent it did so, the Government was relieved of responsibility even if Article 19(a) could be read, as the plaintiff urges, as a promise by the Government to furnish sufficient labor. Such a promise would not mean that it was bound to furnish labor having unusual qualifications not reasonably to be expected to be available.

Even if we construed Article 19(a) of the contract as the plaintiff urges, we do not think that the plaintiff has proved that the labor shortage was the cause of the work's being carried over the winter of 1937–38. The plaintiff relies strongly upon the computation made by the Engineer's Office, in extending the time for the completion of the contract and excusing the plaintiff from the payment of liquidated damages for late completion. By that computation, the plaintiff was said to have been delayed 131 days during the years 1935, 1936, and 1937 because of insufficient labor. By subtracting that number of days from the number of days which, the plaintiff alleges, it used in 1938 to complete the work, the plaintiff says that it shows that the work would have been completed in the fall of 1937.

The determination by the Engineer's Office of the extent of the delay caused by shortages of labor is, of course, not binding here. It made that determination for the purpose of performing its function, provided in the contract, of determining whether liquidated damages for late completion should be assessed or excused. For its purposes, an unavoidable shortage of labor would have been just as good a reason for waiving liquidated damages as a shortage resulting from the fault of the Government or its breach of contract. It did not purport to decide that the Government had breached its contract and was liable in damages for that breach.

The computation of the number of days' delay caused by labor shortages was palpably wrong, since it was based on a mathematically erroneous formula. The method used was to tabulate (1) the number of men requisitioned for labor of various classes, (2) the number of men reporting on time, (3) the number of men at work before the new men were due to report, and (4) the total number of men needed for the work. The percentage of deficiency was then determined by subtracting item (3) from item (4) and dividing the difference by item 4. This formula gave the percentage of deficiency before any of the men requisitioned had reported, but disregarded the number of men who did report. It therefore produced a ratio of deficiency substantially higher than the true ratio, and gave the plaintiff a correspondingly higher number of days of excusable delay. Since, as we have said, the computation is not determinative here, and since it was erroneous, it does not help us to decide whether the plaintiff would have completed the work in 1937 if it had had a sufficient supply of labor.

A witness for the Government presented a recomputation, based upon a formula which eliminated the error in the former one, and which showed that 103 days' time was lost in the years 1935, 1936, and 1937 because of shortages of labor. If this computation is approximately correct, the plaintiff would have had a considerable amount of work to do in 1938, even if it had had sufficient labor in the earlier seasons, and would not have completed the work until about June 15, 1938.

As to many items of its claim, the only evidence presented by the plaintiff as to the amounts of its alleged damages is computations based upon its contention that it would have, but for the shortage of labor, completed the work on November 2, 1937. Even if we were of the opinion that the insufficiency of the labor supply was a breach of contract by the Government, we would not have evidence as to the amount of damage resulting from it, for the period from June 15, 1938, to the completion of the work.

The plaintiff's sixteen causes of action will now be discussed. The first, covered in finding 32, is for the cost of replacing copper strips destroyed by a spring flood in 1938. Since, as we have found, the Government did not by breach of contract cause the work to be carried over into 1938, the plaintiff was bound by its contract to replace any work damaged by flood prior to completion of the contract. Its doing so was not, therefore, extra work, and it is not entitled to extra pay for it.

In its second cause of action, detailed in finding 33, the plaintiff complains that it was required to spread a layer of

mortar on the concrete already placed, whenever it poured additional concrete on top of it. The specifications said "Where necessary to secure adequate bond, the surface of existing concrete shall be cleaned and roughened and shall then be spread with a ½-inch layer of mortar * * * before the new concrete is deposited." The plaintiff was required to spread mortar on all horizontal concrete surfaces, and complains that this was not "necessary to secure adequate bond." The plaintiff protested the requirement on June 19, 1936, and was advised by letter that the requirement would be insisted upon. The plaintiff again protested on October 4, 1938, but the protest was denied by the Contracting Officer and, on appeal, by the Chief of Engineers. Questions of engineering, such as this, were lodged with these officials by the contract, and it is not shown that their decision was not a reasonable one.

■ In its third cause of action the plaintiff complains that it was required to place cork and tar paper in many joints not required by the contract. The specifications provided that expansion joints of cork and tar paper would be made "as indicated or required." Only one was "indicated" specifically on the drawings of the lock and abutment. The reason for this was that the size of the concrete monoliths to be poured was not specified, but was left to the contractor and the Government officials to determine as the work proceeded. As it did proceed, expansion joints were required between all monoliths. The plaintiff seems to have contemplated this requirement, as shown in finding 34. We think the requirement was reasonable, and that the decision of the Contracting Officer and the Chief of Engineers imposing the requirement should not be disturbed.

■ The fourth, fifth, sixth, and seventh causes of action are for costs of electric power, workmen's compensation insurance, unemployment and social security taxes, and surety bond premiums, which were greater because the work was carried over into 1938. See findings 35, 36, 37, 38. As to · the first three items, the rates were higher in 1938 than in 1937. The surety bond would have expired if the work had been completed in 1937, and no premium would have accrued in 1938.

As we have said, the shortage of labor which, the plaintiff claims, caused the work to be carried over into 1938 was not a breach of the contract by the Government. Its consequences cannot therefore, be recovered from the Government. Also, as we have said above, we do not have the evidence from which to determine what these increased costs would have been from June 15, 1938, the approximate date when the contract would have been completed but for the labor shortage, to the date of completion.

■ The eighth cause of action is for the cost of repairing damages to the work caused by cold weather, floods, and ice during the winter of 1937–1938 (Finding 39). The ninth is for the reasonable value for the period of the alleged delay due to labor shortages of the services of the two partners who make up the plaintiff's partnership and who devoted their time to this contract throughout its performance (Finding 40). Since we have found that the Government is not responsible for the delay, these causes of action cannot be sustained.

The tenth and eleventh causes of action are for the cost of upkeep and operation of its plant, and for material, maintenance and overhead charges incurred by it after November 2, 1937, and up to the completion of its work in 1938. Some of these costs resulted from whatever delay was caused by shortages of labor, but we have held that the Government was not answerable for the delay.

■ The twelfth cause of action is for all social security taxes paid to the State of Pennsylvania and the Federal Government on account of the contract work during the several years of its performance (Finding 43). The theory of the claim is that the law imposing these taxes was enacted after the contract was entered into. We think the Government does not, in its contracts, agree to pay any new or increased taxes of general application imposed by a state or by itself. Compare United States v. Standard Rice Co., 323 U.S. 106, 65 S.Ct. 145, affirming 53 F.Supp. 717, 101 ·Ct.Cl. 85.

■ The thirteenth cause of action is for the alleged increased cost of procuring gravel in 1938 over what its cost would have been in 1937 (Finding 44). From what we have said it follows that the plaintiff could not recover this cost, even if the fact and the amount of the increase had been proved. The fifteenth cause of action is for the rental value of the plaintiff's machinery for the alleged period of

delay (Finding 46). This claim is foreclosed by what has been said above. The sixteenth cause of action is alternative to all the others, and claims the difference between what it actually cost it to do the work, plus a reasonable profit, and what it has been paid (Finding 47). Since the Government did not, we have concluded, breach its contract, this claim is not valid.

The fourteenth cause of action is for the cost of a raise of 15 cents in the hourly wages of the plaintiff's common labor. It had been paying 45 cents up to September 19, 1937, when it raised the hourly wage to 60 cents. The contract required the plaintiff to pay not less than 45 cents for common labor. The WPA had other projects in the vicinity of the work, and had been paying 35 cents an hour, but raised its wages to 50 cents. The plaintiff found it difficult to hold workmen on its work. It consulted the Government's representatives and was assured that an increase in its minimum wage would be recommended. If an increase had been directed by the Government, the contract price would have, by the terms of the contract, been increased to cover it. The Contracting Officer requested permission from the Chief of Engineers to order the increase, but permission was denied.

The plaintiff urges that the Government, by its action in raising the wages of WPA laborers in the vicinity from 35 cents to 50 cents, made it necessary for the plaintiff to raise its wages, in order to hold its workmen. We think that, in the circumstances, the Government's action in raising WPA wages made it impossible or difficult for the plaintiff to secure labor at 45 cents an hour. If so, it was a violation of the term which we found in Beuttas v. United States, 101 Ct.Cl. 748, to be implied in all contracts, i. e., that, subject to exceptions not here necessary to define, one party to the contract will not so act as to increase the cost of performance by the other. In the instant case, the contract itself provided that the minimum wage rates set in the contract were subject to change by the contracting officer, and that the contract price should be adjusted to compensate for any change he made. We think it was fairly implied in the contract that if the Government should do something which made it impracticable for the contractor to obtain labor at the minimum wage set in the contract, the power to increase that minimum, and compensate the contractor for the increase would be used. That it was necessary for the plaintiff to raise its wages 5 cents to meet the new WPA wage of 50 cents, seems clear. The plaintiff claims that it was necessary to raise its wages 15 cents, to 60 cents an hour, thus preserving the former differential of 10 cents, in order to get needed labor. Though the proof of this necessity is not very satisfactory, we think that, in the circumstances, it was necessary, since the plaintiff's work was not attractive or desirable, in comparison with other jobs, and since the plaintiff had not been able in the past to get an adequate supply of labor, even by paying the 10 cent differential. We therefore allow recovery of $4,264.58. Whatever additional workmen's compensation costs were incurred as a result of this increase in wages may also be recovered. The court will suspend entry of judgment to await a stipulation of the parties as to the additional workmen's compensation costs.

The plaintiff is entitled to recover $4,264.58 plus the costs of workmen's compensation attributable to that amount of wages.

It is so ordered.

WHALEY, Chief Justice, and WHITAKER, Judge, concur.

JONES, Judge, took no part in the decision of this case.

LITTLETON, Judge (dissenting in part).

I am of opinion that defendant did not breach the wage provisions of its contract with plaintiff and that plaintiff is not, therefore, entitled to recover the amount of $4,264.58 which the court has allowed. LeVeque et al. v. United States, 96 Ct.Cl. 250, and dissenting opinion in Beuttas et al. v. United States, 101 Ct.Cl. 748.

On Motion for a New Trial

PER CURIAM.

This case comes before the court on plaintiff's motion for a new trial, and on consideration thereof:

It is ordered that said motion be and the same is overruled.

WHALEY, Chief Justice, and MADDEN and LITTLETON, Judges concur.

JONES, Judge, took no part in the decision of this case.

WHITAKER, Judge (dissenting).

I think the motion for a new trial in this case should be granted.

The parties agree that the defendant was delayed because there was an insufficient supply of labor; the defendant granted plaintiff an extension of time of 149 days on this account; and the proof convinces me that there was an adequate supply of relief labor on the rolls available for reference to this job. It was not referred to it because the Works Progress Administration refused to furnish to the United States Employment Service the names of men then on relief for referral to this job since the job was in a remote section of the county and transportation facilities were meager and expensive, and the amount a laborer could earn on the job was small. However, the project was established for the benefit of the people in this community on relief in order to take them off of relief and provide employment for them on this project. From this I think there arose an implied agreement on the part of the defendant to furnish plaintiff with relief labor to the extent that such labor was available to it.

If it later developed that it did work an undue hardship on these laborers to refer them to the job then this provision of the contract should have been waived.

It is true that the Works Progress Administration did exempt plaintiff from the requirement of securing certain of its labor from the relief rolls, but this exemption proved inadequate; plaintiff still was unable to get an adequate supply of labor. In this situation and with relief labor in hand adequate to have supplied plaintiff's needs, the obligation was on the defendant either to do all it could do to furnish this relief labor or to waive this article of the contract altogether and permit plaintiff to get its labor where it could. It did neither and as a result thereof the plaintiff was damaged. Plaintiff was entirely without fault, so far as I can see, and in my opinion it is entitled to recover the damage that it has suffered as a result of the defendant's breach of its implied obligation.